UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
EASTERN DIVISION



|  |  |
|---|---|
| Tristin Taylor, individually and as a representative of a class of similarly situated persons, and on behalf of the BDO USA Employee Stock Ownership Plan, | ) ) ) ) ) |
| Plaintiff, | ) ) |
| vs. | ) Case No. |
| BDO USA, P.C., the Board of Directors of BDO USA, P.C., Wayne Berson, BDO ESOP Trustees, Catherine Moy, Stephen Ferrara, Mark Ellenbogen, Matthew Becker, William Eisig, and Patrick Donaghue, | ) CLASS ACTION COMPLAINT ) ) ) ) ) ) ) |
| Defendants. | ) ) |

Plaintiff Tristin Taylor, by and through his attorneys, on behalf of himself, all others similarly situated, and the BDO USA Employee Stock Ownership Plan, alleges the following:

## I.    NATURE OF ACTION

1.    This is a civil enforcement action brought pursuant to Sections 502(a)(2) and 502 (a)(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. § 1132(a)(2) and (a)(3), on behalf of the BDO USA Employee Stock Ownership Plan ("BDO ESOP," "the ESOP," or "the Plan") and the participants and beneficiaries of the ESOP.

2.    The BDO ESOP is an ERISA protected retirement plan whereby the individual retirement accounts of current and former employees are invested entirely in the stock of BDO USA, P.C. ("BDO" or the "Company"). There is no recognized market for BDO stock; thus, the value of the stock must be determined based on a private valuation of the Company.

3.      Plaintiff's claims stem from sale of the Company's stock to the BDO ESOP on August 31, 2023 at an inflated value (the "Transaction") by BDO's executives and other principals of the Company.

4.      Prior to the Transaction, BDO had come under scrutiny by the Public Company Accounting Oversight Board for violations of PCAOB rules and audit standards. For years leading up to the Transaction, the PCAOB had found a higher level of significant deficiencies in BDO's audit work than any other audit firm reviewed by PCAOB.

5.      Rather than find an arm's-length purchaser for their shares that would scrutinize BDO's financial position and wrest control of the Company from their hands, the Company's executives created a captive buyer for their shares through the creation of the ESOP.

6.      The BDO employees who were the intended beneficiaries of the ESOP were not permitted to negotiate the terms or purchase price of the Company stock that executives would offload into employees' retirement accounts. Rather, the Company's Board of Directors selected a trustee that they believed would acquiesce to the Board's will.

7.      Despite the ESOP purchasing Company stock, neither employees nor the ESOP obtained control over the Company's future cash flows or strategic direction. Even worse, the Board adopted an ESOP governance structure such that the ESOP itself was controlled by BDO's executives shortly after the ESOP Transaction. BDO's Executive Team thus retained control and power over the ESOP including the right to vote all shares held by ESOP. As a result, BDO executives received $1.3 billion for selling 42% of their BDO stock but did not give up control over the Company.

8.      The BDO executives who were responsible for facilitating the Transaction faced a substantial conflict of interest, as their personal fortunes were tied to the valuation they could

obtain for the Company's stock.

9.    Ultimately, the ESOP purchased 42% of the Company's common stock for approximately $1,300,000,000. This purchase price exceeded fair market value for the reasons set forth below.

10.    Since the Transaction closed, multiple BDO employees have reported being pressured to inflate revenues in advance of the Transaction. Utilizing inflated revenue to value BDO caused the ESOP to overpay for the Company's stock and unduly enriched the Company's executives.

11.    Prior to the Transaction, the BDO ESOP had no assets with which to purchase the Company's stock. To facilitate the transaction, the Company entered into a private credit deal with Apollo Global Management affiliates ("Apollo"), through which Apollo provided the Company the funds required to consummate the transaction.

12.    Based on the best information available to Plaintiff, the loan between Apollo and the Company carried a floating interest rate based on the Secured Overnight Financing Rate plus 6%. As of December 31, 2023, this resulted in an interest rate of 11.36%. BDO guaranteed and is required to make contributions to the ESOP sufficient to pay all loan payments due, thereby reducing BDO's future cash flows by the amount necessary to service the ESOP's Transaction debt.

13.    Had Defendants provided truthful information concerning BDO's past and future financial performance and ensured that the ESOP trustee conducted the rigorous due diligence required by ERISA, the ESOP would not have purchased 42% of the Company's stock for $1.3 billion while obtaining no control of the Company.

## II.    JURISDICTION AND VENUE

14.    **Subject Matter Jurisdiction**. This Court has subject matter jurisdiction over this

action pursuant to 28 U.S.C. § 1331 and ERISA § 502(a), 29 U.S.C. § 1132(a).

15.    **Personal Jurisdiction.** This Court has personal jurisdiction over Defendants because they transact business in this district by employing employees in this district, selling services in this district and maintaining an office in this district.

16.    **Venue**. Venue is proper in this district pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), for at least the following reasons:

a.    Defendants' alleged breaches of fiduciary duty took place in this district in Boston, Massachusetts;

b.    Defendants may be found in this district, as BDO transacts business and employs individuals in Boston, Massachusetts, and the surrounding area;

c.    Defendant Catherine Moy works and resides in this district.

A.    **Plaintiff**

17.    Plaintiff Tristin Taylor is a current employee of the Company and a participant in the ESOP within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7). Plaintiff Taylor worked for BDO since at least 2019 to the present, and he was a Plan participant at the time of the Transaction. At present, Plaintiff Taylor is 20% vested in the BDO shares allocated to his ESOP account, and he has suffered a financial injury as a result of Defendants' unlawful conduct described herein.

B.    **Defendants**

18.    **Defendant BDO USA, P.C.** ("BDO") is a professional corporation that provides accounting, tax and advisory services throughout the United States. BDO is incorporated in Virginia and maintains an office in Boston, Massachusetts.

19.    BDO sponsors the ESOP and is the "Plan Administrator" of the ESOP within the meaning of ERISA § 3(16)(A), 29 U.S.C. § 1002(16)(A).

20.    Based on the best information available to Plaintiff, BDO agreed to indemnify the

4

ESOP trustee for all fiduciary actions.

21.     BDO is a fiduciary of the ESOP within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), because, *inter alia,* it exercised discretionary authority respecting management of the ESOP; exercised authority or control respecting the management of the ESOP's assets; and/or has discretionary authority or discretionary responsibility in the administration of the ESOP.

22.     **Defendant BDO Board of Directors** and its members (collectively "the Board") administer the ESOP and have power to delegate administrative responsibility to committees. Thus, the Board and BDO have all discretionary power and authority over the ESOP and its operations, unless the Board or Company expressly assigned or delegated any such authority in writing to another individual or entity consistent with the requirements under ERISA 29 U.S.C. § 1102. The Board has complete authority and discretion to interpret and resolve any ambiguities in the Plan terms, make factual determinations and benefit eligibility determinations, review and decide benefit claims, maintain records, establish rules and procedures for Plan administration and contract for outside services for the Plan. BDO and its Board have all discretionary power and authority over the ESOP and its operations, unless the Board or Company delegated any such authority in writing to another individual or entity consistent with the requirements under ERISA 29 U.S.C. § 1102.

　　　　　　　a.     **Wayne Berson** is the Chief Executive Officer of BDO and Chairman of the Board. Defendant Berson has been CEO of BDO since 2012 and was a key architect of the Transaction. He operates out of the Company's Potomac, MD office.

23.     The Board selected and appointed State Street Global Advisors Trust Company ("State Street") to serve as the independent trustee of the ESOP to represent the ESOP's interest

in the Transaction. State Street, on behalf of the ESOP, approved the ESOP's purchase of approximately 42% of BDO stock for $1.3 billion, which was greater than fair market value. State Street, on behalf of the ESOP, also approved all Transaction terms, including the ESOP's borrowing of the amounts necessary to complete the Transaction, and the Company guarantee of the borrowed amount.

24. The Board also selected and appointed the BDO ESOP Trustees to serve as the ESOP's trustee after the Transaction.

25. The Board is a fiduciary of the ESOP within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), because, *inter alia,* it exercised discretionary authority respecting management of the ESOP; exercised authority or control respecting the management of the ESOP's assets; and/or has discretionary authority or discretionary responsibility in the administration of the ESOP.

26. **Defendant BDO ESOP Trustees** is a committee of BDO executives and Board members that have been appointed by the Company to serve as the ESOP's Trustee.

27. The ESOP Trustees selected and appointed by the Board include the following individuals:

   a. **Catherine Moy** is the Company's Chief People Officer and serves as an Executive Team member. Defendant Moy has been employed by BDO since July 2002 and operates out of the Company's Boston, MA office.

   b. **Mark Ellenbogan** has been the Company's Chief Operating Officer since June 6, 2024 and serves as an Executive Team member. Defendant Ellenbogan has been employed by BDO since 1997 and was

previously a member of the Board. As a Board member, Mark chaired its Governance Committee and was an instrumental figure in the establishment of the ESOP. Defendant Ellenbogan operates out of the Company's Potomac, MD office.

c.  **Matthew K. Becker** is the Company's National Managing Principal of Tax and serves as an Executive Team member. Defendant Becker has been employed by BDO since June 2002 and operates out of the Company's Grand Rapids, MI office. Defendant Becker previously served as Chair of the Company's Board of Directors.

d.  **William Eisig** is the Company's National Managing Principal of Assurance and served as an Executive Team member. Defendant Eisig has been employed by BDO since September 2001 and operates of the Company's Potomac, MD office.

e.  **Patrick Donoghue** is the Company's National Managing Principal of Corporate Finance and Transaction Advisory Services. Defendant Donoghue has been employed by BDO since July 2014 and operates out of the Company's New York, NY office.

f.  **Stephen R. Ferrara** was the Company's Chief Operating Officer until June 6, 2024 and served as an Executive Team member. Defendant Ferrara was employed by BDO beginning in 1991 and operated out of the Company's Chicago, IL office.

28. Pursuant to ERISA § 403(a), 29 U.S.C. § 1103(a), the assets of every plan must be held in trust by a trustee who has exclusive authority and discretionary to manage and control

the assets of the plan. As such, the ESOP Trustees, as the Plan's trustee, is a fiduciary of the ESOP within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21).

## III.     FACTUAL ALLEGATIONS

### A.     The Company

29.     BDO is a U.S. division of BDO Global, an international network of public accounting, tax and advisory firms which perform professional services. BDO Global's headquarters are located in Brussels, Belgium.

30.     BDO is the fifth largest accounting firm in the U.S. and maintains operations in most states, including offices in Massachusetts, Maryland, and Michigan.

31.     Prior to July 1, 2023, BDO was structured as a limited liability partnership. On that date, BDO changed its corporate form to a professional corporation.

32.     Effective August 30, 2023, BDO amended its Articles of Incorporation. Under the amended Articles of Incorporation, BDO was authorized to issue two classes of capital stock, including common stock and preferred stock.

33.     BDO was authorized to issue 100,000,000 shares of common stock and 2,500,000 shares of preferred stock.

34.     The amended Articles of Incorporation condition the ability of common stockholders to elect BDO's board members and receive dividends on the rights of the holders of preferred stock.

35.     The amended Articles of Incorporation further require BDO to indemnify its directors and officers to the fullest extent authorized or permitted by applicable law.

36.     Defendants created an ESOP governance structure that provided them control and authority over the ESOP including retaining the power to vote the ESOP's shares in BDO, including voting on members of the BDO Board.

**B.    ESOP Transaction**

37.    On August 31, 2023, the ESOP purchased approximately 42% of BDO's outstanding common stock for approximately $1.3 billion (hereinafter, "the ESOP Transaction" or the "Transaction").

38.    The shares purchased by the ESOP were held by the Company's principals. Because members of the Board and ESOP Trustees held substantial ownership interests before the ESOP Transaction, they were enriched by the Transaction and benefited from an inflated valuation.

39.    The remaining portion of BDO's common stock was retained by certain of the Company's principals.

40.    The Company engaged Stout Risius Ross, LLC ("SRR"), a valuation advisor, to advise it through the Transaction. SRR served as the exclusive financial advisor to BDO and led the ESOP structuring, financing process, and execution on behalf of the company. Both SRR and Aziz El-Tahch—who led the work for SRR on this Transaction—have been the subject of litigation because ESOP sale price valuations they performed in other cases allegedly exceeded fair market value.

41.    The Company, acting through the Board, also selected and appointed State Street to serve as an independent trustee for the ESOP. As trustee for the ESOP, State Street was required to (among other things) perform due diligence into BDO's business and, along with other ESOP fiduciaries such as BDO and the Board, to ensure that the valuation of BDO stock was based on accurate and reasonable information and that ESOP paid no more than fair market value ("FMV") for the Company's stock.

42.    Based on the best information available to Plaintiff, the Company agreed to indemnify State Street for its role in the ESOP Transaction.

43.    Duff & Phelps was engaged as the valuation advisor, to assist in valuing BDO's stock.

44.    Following the Transaction, the Board selected and appointed the ESOP Trustees to serve as the trustee in State Street's place. State Street continues to serve in a consulting role to the ESOP Trustees.

45.    The ESOP did not have any assets prior to the Transaction to purchase BDO stock. To allow the ESOP to purchase BDO stock, the Company, aided by SRR, facilitated a private credit deal in which BDO would borrow money needed to fund the Transaction and make a corresponding loan of that money to the ESOP.

46.    The ESOP's Form 5500 filed with the Department of Labor for the year ending December 31, 2023 disclosed that the ESOP was carrying $1.28 billion in liabilities. This private credit deal placed an enormous debt burden on BDO and the ESOP.

47.    Based on the best information available to Plaintiff, the loan between Apollo and the BDO carried a floating interest rate based on the Secured Overnight Financing Rate plus 6%. As of December 31, 2023, this resulted in an interest rate of 11.36%.

48.    BDO guaranteed and is required to make contributions to the ESOP sufficient to pay all loan payments due, thereby reducing BDO's future cash flows by the amount necessary to service the ESOP's Transaction debt.

### C.    The Transaction Price Exceeded Fair Market Value

49.    The purchase price that the ESOP paid, approximately $1.3 billion, far exceeded the fair market value of the purchased shares.

50.    The BDO stock valuation relied upon to justify the $1.3 million purchase price was flawed. In particular, the stock valuation was based on inflated earnings and unreasonable projections, and excluded material facts relevant to the valuation.

51.     Based on the best information available to Plaintiff, the Company's executive team, including members of the Board and ESOP Trustees, were responsible for preparing the internal financial information about the Company's performance that was used to value the Company.

52.     The Company's executive team suffered from a conflict of interest in connection with the Transaction. The Company's executives had a substantial ownership interest in the Company prior to the Transaction. As a result, any increase in the stock valuation directly inured to their benefit.

1.     BDO Provided Inflated Revenues to Value the Company's Stock.

53.     Since the Transaction, Company employees, including a Healthcare Transaction Advisory Services National Practice Leader and Tax Practice Leader, have disclosed pressure from the Company to overinflate revenues in advance of the Transaction date.[1]

54.     Employees were pressured to inflate revenues by manipulating and/or mis-attributing client "Credits" as revenue. Credits are either prepayments (e.g., retainer amounts) or amounts paid more than the actual worked performed that either must be refunded to the client or applied against future work.

55.     Based on the best information available to Plaintiff, BDO's pressure campaign caused both historic and projected earnings to be inflated. These inflated earnings were used to value the Company.

56.     During the time period in which BDO employees were pressured to inflate revenues, the Company experienced a marked increase in revenue growth.

---

[1] *BDO USA, P.C., v. Ankura Consulting Grp., LLC, et al*, No. 3:24-cv-00179, ECF 65 at 50 (E.D. Va. Sept. 16, 2024); *BDO USA, P.C., v. Crandell,* No. 3:24-cv-00012, ECF 31 at 35 (E.D. Va. Apr. 25, 2024).

57.    On July 6, 2023, the Company reported a year-over-year revenue increase of 13.3% during the fiscal year ending April 30, 2023.

58.    Similarly, on July 12, 2022, the Company reported a year-over-year revenue increase of nearly 25% during the fiscal year ending April 30, 2022.

59.    The Company's revenue growth slowed following the Transaction. On December 18, 2024, the Company reported a revenue increase of only about 4% for its United States and Canada operations during the fiscal year ending September 30, 2024. The Company has not yet disclosed revenues for the United States alone.

60.    Had Defendants provided accurate, honest and complete information about BDO's operations, the ESOP would not have paid a purchase price in excess of fair market value.

    2.    The Quality of BDO's Services was Deteriorating in the Run-up to the Transaction.

61.    During the period leading into the Transaction, the quality of BDO's audit work also deteriorated.

62.    Each year, the Public Company Accounting Oversight Board (PCAOB) releases an inspection report for 14 U.S. accounting firms. BDO is among the 14 accounting firms reviewed by the PCAOB.

63.    In 2021, 2022, and 2023, the PCAOB's review found that BDO had the highest number of Part I.A deficiencies among the reviewed accounting firms.

64.    PCAOB defines Part I.A deficiencies as "[d]efficiencies in reviewed issuer audit that were of such significance that the Board believes that the firm, at the time it issued its audit report, had not obtained sufficient appropriate audit evidence to support its opinion on the

issuer's financial statements and/or ICFR [Internal Control over Financial Reporting]."[2]

65.     As the following tables[3] illustrate, the Part I.A deficiencies the PCAOB observed also increased substantially during the years leading up to the Transaction, from 53% in 2021 to 86% in 2023.

| TABLE 2 | | | |
|---|---|---|---|
| 2021 INSPECTIONS OF U.S. AFFILIATE OF GLOBAL NETWORKS (Reports are dated November 4, 2022, except EY, which is dated November 21, 2022, and were released on December 19, 2022) | | | |
| Firm | Engagements Inspected | Deficient Engagements Described in Part I.A. | Percentage of Inspected Engagements with Deficiencies |
| BDO | 30 | 16 | 53% |
| Deloitte & Touche | 54 | 7 | 13% |
| Ernst & Young | 56 | 12 | 21% |
| Grant Thornton | 31 | 7 | 23% |
| KPMG | 54 | 14 | 26% |
| PwC | 56 | 2 | 4% |
| Global Network Firm Totals | 281 | 58 | |
| Global Network Firm Averages | 47 | 10 | 21% |

---

[2] PCAOB Inspection Procedures: What Does the PCAOB Inspect and How Are Inspections Conducted?, Public Accounting Oversight Board, https://pcaobus.org/oversight/inspections/inspection-procedures (last visited Jan. 17, 2025).

[3] 2023 PCAOB Large Firm Inspection Reports, Auditor Comm. and Auditor Oversight Update (Aug. 26, 2024), https://www.auditupdate.com/post/2023-pcaob-large-firm-inspection-reports; 2022 PCAOB Large Firm Inspection Reports – Updated, Auditor Comm. and Auditor Oversight Update (May 31, 2024), https://www.auditupdate.com/post/2022-pcaob-large-firm-inspection-reports-updated; 2021 PCAOB Large Firm Inspection Reports, Auditor Comm. and Auditor Oversight Update (Dec. 29, 2024), https://www.auditupdate.com/post/2021-pcaob-large-firm-inspection-reports.

TABLE 1

**2022 INSPECTIONS OF U.S. AFFILIATE OF GLOBAL NETWORKS**
(Reports are dated between November 7, 2023, and December 20, 2023,
and were released on February 28, 2024; unredacted KPMG report released on April 26, 2024)

| Firm | Engagements Inspected | Deficient Engagements Described in Part I.A | Percentage of Inspected Engagements with Deficiencies |
|------|------|------|------|
| BDO | 29 | 19 | 66% |
| Deloitte & Touche | 53 | 9 | 17% |
| Ernst & Young | 54 | 25 | 46% |
| Grant Thornton | 26 | 8 | 31% |
| KPMG | 54 | 16 | 30% |
| PwC | 54 | 5 | 9% |
| Global Network Firm Totals | 270 | 82 | |
| Global Network Firm Averages | 45 | 14 | 30% |

TABLE 1

**2023 INSPECTIONS OF U.S. AFFILIATE OF GLOBAL NETWORKS**
(Reports are dated between May 23, 2024, and June 20, 2024,
and were released on August 15, 2024)

| Firm | Engagements Inspected | Deficient Engagements Described in Part I.A | Percentage of Inspected Engagements with Deficiencies |
|------|------|------|------|
| BDO | 29 | 25 | 86% |
| Deloitte & Touche | 56 | 12 | 21% |
| Ernst & Young | 59 | 22 | 37% |
| Grant Thornton | 28 | 15 | 54% |
| KPMG | 58 | 15 | 26% |
| PwC | 57 | 10 | 18% |
| Global Network Firm Totals | 287 | 99 | |
| Global Network Firm Averages | 48 | 17 | 34% |

66.     BDO's lax adherence to PCAOB rules and audit standards has resulted in substantial fines for the Company. Shortly after the Transaction, on September 26, 2023, the PCAOB announced that it was sanctioning BDO and partners Keven Olvera and Michael Musick over $2 million for violations of PCAOB rules and audit standards.

67.     The price that the ESOP paid for BDO shares should have been, but was not, adequately reduced to reflect the reputational harm and direct financial harm caused by BDO's worsening performance.

3.     <u>The ESOP Did Not Obtain Control over the Company or its Cash Flows.
This Substantially Impairs the Marketability of the ESOP's Shares.</u>

14

68.     The approved ESOP Transaction sale price also failed to fully account for the fact that the Company's Executive team and existing Board of Directors retained control over the Company.

69.     Because the ESOP holds a minority interest in the Company, it is unable to select the Company's management or exercise any control over its cash flows.

70.     Despite the sale to the ESOP, BDO's Board of Directors and management team continue to guide the firm's strategy and operations.

71.     Moreover, because the Articles of Incorporation condition the Company's dividend policy on preferred stock rights, the ESOP's ability to share in a proportionate share of the Company's profits may be impaired.

72.     After the ESOP Transaction, Defendants retained the same level of control over BDO as they had beforehand because they installed themselves as ESOP Trustees with the power to vote the ESOP's shares in the Company.

73.     The price an investor is willing to pay for a company's equity is materially affected by the degree to which the investor's equity interest will give the investor control over the company.

74.     Non-controlling interests trade at a substantial discount (generally over 20% and as much as 40%) relative to a controlling interest in a company.

75.     The price that the ESOP paid should have been, but was not, adequately reduced to discount for lack of control, given that the ESOP did not actually obtain operational control over the Company, its cash flows, or its Board of Directors.

76.     The ESOP's ability to sell its shares of BDO is materially impaired given the limited and conditional rights afforded to those shares.

15

77. Shares that are not readily marketable trade at a discount far in excess of 10%.

78. Based on the best information available to Plaintiff, the valuation also exceeded fair market value because it did not adequately discount for the share's lack of marketability. Rather, the valuation failed to consider the ESOP's inability to readily sell its shares to a third-party as a result of participants' ability to put their shares on the Company.

## IV.    PLAINTIFF SEEKS PLAN-WIDE RELIEF

79. Plaintiff brings these claims for plan-wide relief pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), and as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b), on behalf of the following Class:[4]

> All participants in the BDO ESOP on or after August 31, 2023 who vested under the terms of the ESOP, and those participants' beneficiaries, excluding Defendants and their immediate family members; any fiduciary of the Plan; the officers and directors of BDO or of any entity in which a Defendant has a controlling interest; and legal representatives, successors, and assigns of any such excluded persons.

80. ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), provides that "[a] civil action may be brought [. . .] by a participant, beneficiary or fiduciary for appropriate relief under [ERISA section 409, 29 U.S.C.] section 1109[.]". In turn, ERISA section 409(a) states that any fiduciary with respect to a plan who breaches "any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter *shall be personally liable to make good to such plan any losses to the plan resulting from each such breach*[.]" 29 U.S.C. § 1109(a) (emphasis added).

81. The Supreme Court has explained that Plaintiff's ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), claims are necessarily "brought in a representative capacity on behalf of the plan as

---

[4] Plaintiff reserves the right to revise the class definition, and to propose other or additional classes in subsequent pleadings or their motion for class certification, after discovery in this action.

a whole." *Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 142 n.9 (1985). In other words, the relief Plaintiff seeks pursuant to § 1132(a)(2) "inures to the benefit of the plan *as a whole*." *Id.* at 140 (emphasis added).

82.    In *LaRue v. DeWolff, Boberg, and Associates, Inc.*, 552 U.S. 248 (2008), which involved a defined contribution plan like the BDO ESOP, the Supreme Court further explained that "[ERISA] §§ 409(a) and 502(a)(2) [29 U.S.C. §§ 1109 and 1132(a)(2)] permit recovery of *all* plan losses caused by a fiduciary breach." *Id.* at 261 (Thomas, J., concurring).

83.    **Numerosity.** The Class satisfies the numerosity requirement because it is composed of thousands of persons. The Plan currently has approximately 10,000 participants. The number of Class members is so large that joinder of all its members is impracticable.

84.    **Commonality.** As to the members of the Class, this case presents numerous common questions of law and fact, among them:

  a.    Whether BDO and the Board engaged in a prudent and loyal investigation of the proposed purchase of shares of BDO stock by the ESOP in the Transaction, including whether the Transaction's terms and price were fair and in the best interest of ESOP participants;

  b.    Whether BDO and the Board provided inflated financial metrics of BDO revenues and earnings for purposes of assessing the value of BDO stock;

  c.    Whether BDO and the Board failed to properly consider BDO's guarantee of the ESOP's $1.3 billion loan, which would be classified as debt on BDO's balance sheet and a charge to shareholders' equity;

  d.    Whether BDO and the Board failed to properly consider the reduced cash flow the Company would suffer due to its obligation to make contributions to the ESOP in an amount sufficient to cover the ESOP's loan payments;

  e.    Whether Company executives benefitting from the Transaction were involved in the preparation of financial projections used in appraisals of BDO stock that formed the basis of the stock appraisal relied upon to set the ESOP purchase price;

f.      Whether BDO and Board adequately monitored the performance of State Street in approving the Transaction;

g.      Whether the ESOP Trustees were aware of fiduciary breaches that resulted in the Transaction;

h.      Whether the ESOP engaged in prohibited transactions;

i.      The amount of losses suffered by the ESOP as a result of the unlawful conduct alleged herein;

j.      The proper form of equitable and injunctive relief; and

k.      The extent to which any non-fiduciary Defendants are subject to equitable remedies and relief.

85.     **Typicality.** Plaintiff's claims are typical of the claims of the Class because (among other things): (a) he is employed by BDO and is a participant in the Plan; (b) to the extent that Plaintiff seeks relief on behalf of the Plan pursuant to § 502(a)(2) of ERISA, 29 U.S.C. § 1132(a)(2), his claims are not only typical of, but the same as, a claim under § 502(a)(2) brought by any other Class member; (c) to the extent that Plaintiff seeks equitable relief, that relief would affect all Class members equally; and (d) all of the Class members were injured and continue to be injured in the same manner, because each of them overpaid for BDO stock as a result of the same alleged breaches of fiduciary duty and prohibited transactions.

86.     **Adequacy.** Plaintiff will fairly and adequately protect the interests of the Class and is committed to the vigorous representation of the Class. Plaintiff's retained counsel, Cohen Milstein Sellers and Toll PLLC ("Cohen Milstein"), is experienced in class action and ERISA litigation, and Plaintiff has no interests antagonistic to or in conflict with the interests of the Class.

87.     **Rule 23(b)(1)(A).** Class certification is appropriate pursuant to Federal Rule of Civil Procedure 23(b)(1)(A). Fiduciaries of ERISA-covered plans have a legal obligation to act consistently with respect to all similarly situated participants and to act in the best interests of the

ESOP and its participants. This action challenges whether Defendants acted consistently with their fiduciary duties or otherwise violated ERISA as to the ESOP as a whole. As a result, prosecution of separate actions by individual members would create the risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants relating to the ESOP. The Class may be certified under Rule 23(b)(1)(A).

88.    **Rule 23(b)(1)(B).** Class certification is also appropriate pursuant to Federal Rule of Civil Procedure 23(b)(1)(B). Administration of an ERISA-covered plan requires that all similarly situated participants be treated the same. Resolving whether Defendants fulfilled their fiduciary obligations to the ESOP and engaged in prohibited transactions with respect to the Plan would, as a practical matter, be dispositive of the interests of the other participants in the ESOP and would substantially impair or impede their ability to protect their interests if they are not made parties to this litigation by being included in the Class. Further, the relief granted by the Court, including any equitable relief, injunctive relief, or accounting of profits, may be dispositive of the interests of other class members.

89.    **Rule 23(b)(2).** Additionally and alternatively, class certification is appropriate pursuant to Federal Rule of Civil Procedure 23(b)(2) because Defendants have acted or refused to act on grounds generally applicable to the Class, making appropriate declaratory and injunctive relief with respect to Plaintiff and the Class as a whole. This action challenges whether Defendants acted consistently with their fiduciary duties or otherwise violated ERISA as to the ESOP as a whole. The members of the Class are entitled to declaratory and injunctive relief to remedy Defendants' fiduciary violations. Further, as ERISA is based on trust law, any monetary relief consists of equitable monetary relief that is either provided directly by the declaratory or injunctive relief or flows as a necessary consequence of that relief.

90.      **Rule 23(b)(3)**. Additionally and alternatively, class certification is appropriate pursuant to Federal Rule of Civil Procedure 23(b)(3) because questions of law and fact common to all Class members predominate over any questions affecting individual members of the Class, and because a class action is superior to other available methods for the fair and efficient adjudication of this action. Common questions related to liability will necessarily predominate over any individual questions because Defendants' duties and obligations were uniform to all participants and therefore all members of the Class. Plaintiff and all Class members have been harmed by the ESOP paying more than fair market value for BDO stock in the Transaction. As relief and any recovery will be on behalf of the Plan, common questions as to remedies will likewise predominate over any individual issues.

91.      A class action is a superior method to other available methods for the fair and efficient adjudication of this action. As the claims are brought on behalf of the ESOP, the issues in this litigation will be most efficiently resolved in a single proceeding rather than multiple proceedings. The losses suffered by individual Class members are small compared to the expense and burden of individual prosecution of this action. In addition, class certification is superior because it will obviate the need for unduly duplicative litigation which might result in inconsistent judgments about Defendants' duties with regard to the ESOP.

92.      Notice will be provided to all members of the Class to the extent required by Federal Rule 23.

## V.   CAUSES OF ACTION

### Count I
### Prohibited Transaction in Violation of ERISA § 406(a), 29 U.S.C. § 1106(a)

### (Against BDO and the Board)

93.   Plaintiff incorporates the preceding paragraphs as though set forth herein.

94.   ERISA § 406(a)(1), 29 U.S.C. § 1106(a)(1), requires that a plan fiduciary "shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect (A) sale or exchange, or leasing of any property between the plan and a party in interest," or a "(D) transfer to, or use by or for the benefit of a party in interest, of any assets of the plan."

95.   ERISA § 406(a)(1)(B), 29 U.S.C. § 1106(a)(1)(B), provides that a plan fiduciary shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes the direct or indirect loan of money between the plan and a party in interest, which includes Company insiders.

96.   ERISA § 3(14), 29 U.S.C. § 1002(14), defines a "party in interest" to include

- "any fiduciary … of such employee benefit plan;"

- "an employer any of whose employees are covered by such plan;" or

- "an employee, officer, [or] director . . . or a 10 percent or more shareholder" of an employer whose employees are covered by the ESOP;

ERISA § 3(14)(A), (C), (H), and (F), 29 U.S.C. § 1002(14)(A), (C), (H), and (F).

97.   The ESOP purchased BDO stock from the Company's principals. Each principal is or was an employee, officer, or director of BDO, whose employees are participants in the ESOP. As such, each of the Company's principals is a party in interest to the ESOP within the meaning of ERISA § 3(14), 29 U.S.C. § 1002(14).

98.   The ESOP's purchase of BDO common stock from the Company's principals

constituted a direct or indirect exchange of property between the ESOP and parties in interest in violation of ERISA § 406(a)(1)(A), 29 U.S.C. § 1106(a)(1)(A), as well as a transfer of ESOP assets to the principals in violation of ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D).

99.     Thereafter, each individual payment to the principals by the ESOP constituted another indirect exchange of property between the ESOP and the principals in violation of ERISA § 406(a)(1)(A), 29 U.S.C. § 1106(a)(1)(A), as well as a transfer of the ESOP assets to the principals in violation of ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D).

100.     The provision of debt through the Company to fund the Transaction constituted separate prohibited transactions in violation of ERISA § 406(a)(1)(B), 29 U.S.C. § 1106(a)(1)(B).

101.     Each payment by the ESOP of principal or interest to the principals or to the Company in connection with these loans constitutes an independent violation of ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D).

102.     BDO and the Board orchestrated the Transaction by working with personal advisors who designed a complicated leveraged Transaction that caused the ESOP to purchase BDO shares for more than fair market value and caused the ESOP to endure unreasonable financing terms as part of the ESOP Transaction.

103.     BDO, acting through the Board, selected and appointed State Street as the trustee for the Transaction and the affiliated ESOP Committee as Trustee after the Transaction.

104.     Because the BDO and the Board Defendants breached their fiduciary duties in orchestrating the Transaction and failing to monitor State Street's actions during the relevant period, each of them caused the numerous prohibited transactions alleged in this Count, thereby causing losses to the ESOP and are thus liable for appropriate relief under ERISA § 409, 29 U.S.C. § 1109, and ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), in connection with those

prohibited transactions.

## Count II
## Prohibited Transaction in Violation of ERISA § 406(b), 29 U.S.C. § 1106(b)
### (Against the Board)

105.    Plaintiff incorporates the preceding paragraphs as though set forth herein.

106.    ERISA § 406(b)(1), 29 U.S.C. § 1106(b)(1), prohibits a fiduciary from "deal[ing] with the assets of the plan in his [or her] own interest or for his [or her] own account[.]"

107.    ERISA § 406(b)(3), 29 U.S.C. § 1106(b)(3), prohibits a plan fiduciary from "receiv[ing] any consideration for his [or her] own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan." 29 U.S.C. § 1106(b)(3).

108.    As alleged above, the Board was a fiduciary of the BDO ESOP before, during and after the Transaction.

109.    The Board orchestrated and caused the sale of BDO stock to the ESOP in the Transaction to enrich themselves and thus dealt with ESOP assets in their own interest within the meaning of ERISA § 406(b)(1), 29 U.S.C. § 1106(b)(1).

110.    As fiduciaries, the Board caused the ESOP Transaction whereby Board members received consideration for their own personal accounts in the Transaction within the meaning of ERISA § 406(b)(3), 29 U.S.C. § 1106(b)(3).

111.    These prohibited transactions caused losses to the ESOP and enriched the Board members.

112.    The Board is liable for appropriate relief under ERISA § 409, 29 U.S.C. § 1109, and ERISA § 502(a)(2) and (3), 29 U.S.C. § 1132(a)(2) and (3), for these prohibited transactions.

<u>**Count III**</u>
<u>**Breaches of Fiduciary Duty in Violation of ERISA §§ 404(a)(1)(A) and (B), 29**</u>
<u>**U.S.C. §§ 1104(a)(1)(A) and (B)**</u>
**(Against BDO and the Board)**

113.     Plaintiffs incorporate the preceding paragraphs as though set forth herein.

114.     The ESOP grants the Company, acting through the Board of Directors, the power to appoint and remove the trustee of the ESOP.

115.     Exercising this power, the Board selected and appointed State Street as trustee solely to approve the ESOP Transaction and then selected and appointed insiders (the ESOP Trustees) as trustees of the ESOP after the consummation of the Transaction.

116.     The Board who are responsible for selection, retention and monitoring of Plan fiduciaries are themselves fiduciaries with respect to the ESOP, and are subject to ERISA's duties of loyalty and prudence with regard to the selection and retention of their appointed fiduciaries. *See* 29 C.F.R. § 2509.75-8 (D-4) (2023).

117.     BDO is additionally named as the Plan Administrator and administers the ESOP through the Board.

118.     BDO and the Board also breached their fiduciary duties by failing to provide complete and accurate information to State Street and by not appropriately monitoring State Street as the trustee during the Transaction. After appointing State Street to serve in this role, BDO and the Board had an ongoing obligation to provide complete and accurate information to State Street and to monitor its work to ensure that it was acting in compliance with statutory standards under ERISA. *See* 29 C.F.R. § 2509.75-8 (FR-17) (2023). However, BDO and the Board failed to do so and thus enabled State Street to approve the Transaction for a sale price that far exceeded the fair market value of the shares that were purchased.

119.     Among other things, BDO and the Board:

a.    failed to make sure that State Street had adequate controls over its fiduciary processes, including protections to ensure that it hired competent valuation advisors and did not unreasonably rely on flawed valuations of BDO stock;

b.    failed to make sure that State Street and its advisors received complete and accurate information in connection with the ESOP Transaction, including information relating to potential business risks such as increasing audit engagement deficiencies which resulted in fines;

c.    failed to make sure that State Street received accurate and realistic financial projections during the due diligence process;

d.    failed to make sure that State Street fully considered all relevant factors with respect to the Transaction;

e.    failed to monitor State Street fiduciary processes; and

f.    failed to ensure that State Street took appropriate remedial action after the Transaction.

120.    The Board and BDO are liable for appropriate relief under ERISA § 409, 29 U.S.C. § 1109, and ERISA §§ 502(a)(2) and (3), 29 U.S.C. §§ 1132(a)(2) and (3), for their failure to appropriately monitor State Street as the Trustee in a manner consistent with ERISA's fiduciary standards.

### <u>Count IV</u>
### <u>Co-Fiduciary Liability Under ERISA § 405(a), 29 U.S.C. §§ 1105(a)</u>
### (Against all Defendants)

121.    Plaintiffs incorporate the preceding paragraphs as though set forth herein.

122.    ERISA § 405(a), 29 U.S.C. § 1105(a) provides that a fiduciary "with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan … if he participates knowingly in … an act or omission of such other fiduciary…; if, by his failure to comply with section 1104(a)(1) … he has enabled such other fiduciary to commit a breach; or if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach."

123.    As discussed above, the Defendants were all Executive level or Board members who facilitated the preparation of materials used to value the Company and the Transaction itself. As such, Defendants had knowledge of the fiduciary breaches and the prohibited transactions set forth herein, and knowingly participated in and facilitated those prohibited transactions.

124.    BDO and the Board enabled breaches during the ESOP Transaction by, among other things, preparing and providing inaccurate and unreasonable financial information to be used for the valuation of the Company.

125.    Defendants made no effort, much less reasonable efforts, to remedy those fiduciary breaches and prohibited transactions.

126.    Based on the foregoing, the Defendants are liable as co-fiduciaries under ERISA § 405(a), 29 U.S.C. § 1105(a), for others' fiduciary breaches and other ERISA violations, and subject to appropriate relief under ERISA § 409, 29 U.S.C. § 1109, and ERISA §§ 502(a)(2) and (3), 29 U.S.C. §§ 1132(a)(2) and (3).

## VI.    **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of the Plan and the class, pray that judgment be entered against Defendants on each Count and that the Court grant all available relief to address the ERISA violations referenced herein, including (among other things):

A.    Declaring that Defendants have each breached their fiduciary duties under ERISA;

B.    Enjoining Defendants from further violations of their fiduciary responsibilities, obligations, and duties;

C.    Removing ESOP Trustees as the Trustee of the BDO ESOP and barring it from serving as a fiduciary of the ESOP in the future;

D.    Appointing a new independent fiduciary to manage the BDO ESOP and ordering the costs of such independent fiduciary be paid for by Defendants;

E.      Ordering each fiduciary found to have violated ERISA to restore all losses resulting from their fiduciary breaches and to disgorge all profits made through use of assets of the ESOP;

F.      Ordering that Defendants provide other appropriate equitable relief to the ESOP, including but not limited to providing an accounting for profits, ordering surcharge against Defendants to restore losses to the ESOP, rescinding or reforming the Transaction, and imposing a constructive trust and/or equitable lien on any funds wrongfully held by any of the Defendants;

G.      Enjoining the Defendants from dissipating any of the proceeds they received from the Transaction held in their actual or constructive possession until the ESOP participants' rights can be adjudicated;

H.      Enjoining the Defendants from transferring or disposing of any of the proceeds they received from the Transaction to any person or entity, which would prejudice, frustrate, or impair the ESOP participants' ability to recover the same;

I.      Requiring Defendants to pay attorneys' fees and costs pursuant to ERISA § 502(g), 29 U.S.C. § 1132(g), and/or ordering payment of fees and expenses to Plaintiffs' counsel on the basis of the common benefit or common fund doctrine out of any money recovered for the class;

J.      Awarding pre-judgment interest and post-judgment interest; and

K.      Awarding such other and further relief that the Court determines to be appropriate pursuant to ERISA § 502(a)(2) and/or § 502(a)(3), 29 U.S.C. § 1132(a)(2) and/or 1132(a)(3), or pursuant to Rule 54(c) of the Federal Rules of Civil Procedure, or that is otherwise equitable and just.

January 17, 2025                              Respectfully submitted,


                                             /s/ Michelle C. Yau
                                             Michelle C. Yau, Mass. Bar # 657236
                                             Daniel R. Sutter (*pro hac vice* forthcoming)
                                             Ryan A. Wheeler (*pro hac vice* forthcoming)
                                             Caroline E. Bressman (*pro hac vice* forthcoming)
                                             Cohen Milstein Sellers & Toll PLLC
                                             1100 New York Ave NW ● 8th Floor
                                             Washington, DC 20005
                                             (202) 408-4600
                                             myau@cohenmilstein.com
                                             dsutter@cohenmilstein.com
                                             rwheeler@cohenmilstein.com
                                             cbressman@cohenmilstein.com


                                             *Attorneys for Plaintiff*