UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
EASTERN DIVISION

| | |
|---|---|
| Tristin Taylor, individually and as a representative of a class of similarly situated persons, and on behalf of the BDO USA Employee Stock Ownership Plan, | ) ) ) ) ) |
| Plaintiff, | ) ) |
| vs. | ) Civil Action No. 1:25-cv-10128-RGS ) |
| BDO USA, P.C., the Board of Directors of BDO USA, P.C., Wayne Berson, BDO ESOP Trustees, Catherine Moy, Stephen Ferrara, Mark Ellenbogen, Matthew Becker, William Eisig, and Patrick Donoghue, | ) AMENDED CLASS ACTION COMPLAINT ) ) ) ) ) |
| Defendants. | ) |

Plaintiff Tristin Taylor, by and through his attorneys, on behalf of himself, all others similarly situated, and the BDO USA Employee Stock Ownership Plan, alleges the following:

## I.     NATURE OF ACTION

1.     This is a civil enforcement action brought pursuant to Sections 502(a)(2) and 502 (a)(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. § 1132(a)(2) and (a)(3), on behalf of the BDO USA Employee Stock Ownership Plan ("BDO ESOP," "the ESOP," or "the Plan") and the participants and beneficiaries of the ESOP.

2.     The BDO ESOP is an ERISA protected retirement plan whereby the individual retirement accounts of current and former employees are invested entirely in the stock of BDO USA, P.C. ("BDO" or the "Company"). There is no recognized market for BDO stock; thus, the value of the stock must be determined based on a private valuation of the Company.

1

3.      Plaintiff's claims stem from sale of the Company's stock to the BDO ESOP on August 31, 2023 at an inflated value (the "Transaction") by BDO's executives and other principals of the Company.

4.      The Transaction was the culmination of an expansive campaign by the Company's Board and executives to inflate the Company's profitability and force through corporate changes needed for the Transaction to occur.

5.      Prior to the Transaction, BDO had come under scrutiny by the Public Company Accounting Oversight Board ("PCAOB") for violations of PCAOB rules and audit standards. For years leading up to the Transaction, the PCAOB had found a higher level of significant deficiencies in BDO's audit work than any other audit firm reviewed by PCAOB.

6.      Rather than find an arm's-length purchaser, who would scrutinize BDO's financial position and wrest control of the Company from their hands, the Company's executives created a captive buyer for their shares through the creation of the ESOP.

7.      The BDO employees who were the intended beneficiaries of the ESOP were not permitted to negotiate the terms or purchase price of the Company stock that executives would offload into employees' retirement accounts. Rather, the Company's Board of Directors selected a trustee that they believed would acquiesce to the Board's will, at least in part, because the Company agreed to indemnify the trustee for any actions it took on behalf of the ESOP.

8.      Despite the ESOP purchasing Company stock, neither employees nor the ESOP obtained control over the Company's future cash flows or strategic direction. Even worse, the Board adopted an ESOP governance structure such that the ESOP itself was controlled by BDO's executives shortly after the ESOP Transaction. BDO's Executive Team thus retained control and power over the ESOP including the right to vote all shares held by ESOP. As a result, BDO

executives received $1.24 billion for selling 42% of their BDO stock but did not give up control over the Company (not even a single Board seat).

9.      The BDO executives who were responsible for facilitating the Transaction faced a substantial conflict of interest, as their personal fortunes were tied to the valuation they could obtain for the Company's stock.

10.     Ultimately, the ESOP purchased 42% of the Company's common stock for approximately $1,242,025,992 or approximately $100 per share. This purchase price exceeded fair market value for the reasons described herein.

11.     Since the Transaction closed, multiple BDO employees have reported being pressured to inflate revenues in advance of the Transaction. Utilizing inflated revenue resulted in inflated 2023 Earnings Before Interest, Taxes, Depreciation, and Amortization ("EBITDA"), a metric that measures a company's operating profitability, which caused the ESOP to overpay for the Company's stock and unduly enriched the Company's executives.

12.     The independent fiduciary that Defendants engaged to bless the Transaction, State Street Global Advisors Trust Company ("State Street"), was kept in the dark about the campaign within BDO to force through the Transaction on terms that were sufficiently rewarding for the Company's leadership.

13.     Prior to the Transaction, the BDO ESOP had no assets with which to purchase the Company's stock. To facilitate the transaction, the Company entered into a private credit deal with Apollo Global Management affiliates ("Apollo"), through which Apollo provided the Company the funds required to consummate the transaction.

14.     Based on the best information available to Plaintiff, the loan between Apollo and the Company carried a floating interest rate based on the Secured Overnight Financing Rate plus

6% (hereinafter the "Acquisition Loan"). As of December 31, 2023, this resulted in an interest rate of 11.36%, which caused unreasonably high interest that was borne by Plan participants whose retirement contributions paid such interest.

15.    BDO guaranteed and is required to make contributions to the ESOP sufficient to pay all loan payments due, thereby reducing BDO's future cash flows by the amount necessary to service the ESOP's Transaction debt.

16.    Had Defendants provided truthful information to State Street, the ESOP trustee, concerning BDO's past and future financial performance and ensured that State Street conducted the rigorous due diligence required by ERISA, the ESOP would not have purchased 42% of the Company's stock for $1.24 billion.

## II.    **JURISDICTION AND VENUE**

17.    **Subject Matter Jurisdiction**. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA § 502(a), 29 U.S.C. § 1132(a).

18.    **Personal Jurisdiction.** This Court has personal jurisdiction over Defendants because they transact business in this district by employing employees in this district, selling services in this district and maintaining an office in this district.

19.    **Venue**. Venue is proper in this district pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), for at least the following reasons:

     a.    Defendants' alleged breaches of fiduciary duty took place in this district in Boston, Massachusetts;

     b.    Defendants may be found in this district, as BDO transacts business and employs individuals in Boston, Massachusetts, and the surrounding area;

     c.    Defendant Catherine Moy works and resides in this district.

### A.    **Plaintiff**

20.    Plaintiff Tristin Taylor is a current employee of the Company and a participant in

the ESOP within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7). Plaintiff Taylor has worked

for BDO beginning in 2019 until 2025, and he was a Plan participant at the time of the Transaction.

At present, Plaintiff Taylor is 20% vested in the BDO shares allocated to his ESOP account, and

he has suffered a financial injury—in the form of losses in his retirement account— as a result of

Defendants' unlawful conduct described herein.

B.     **Defendants**

21.     **Defendant BDO USA, P.C.** ("BDO") is a professional corporation that provides

accounting, tax, and advisory services throughout the United States. BDO is incorporated in

Virginia and maintains an office in Boston, Massachusetts.

22.     BDO sponsors the ESOP and is the "Plan Administrator" of the ESOP within the

meaning of ERISA § 3(16)(A), 29 U.S.C. § 1002(16)(A).

23.     Based on the best information available to Plaintiff, BDO agreed to indemnify the

ESOP trustee for all fiduciary actions.

24.     BDO is named as a fiduciary in the governing document for the ESOP and through

its Board had the power to appoint the trustee of the ESOP. BDO, acting through the Board,

appointed State Street to serve as the independent trustee of the ESOP. As such, BDO was a

fiduciary of the ESOP within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), because, *inter*

*alia,* it exercised discretionary authority respecting management of the ESOP; exercised authority

or control respecting the management of the ESOP's assets; and/or has discretionary authority or

discretionary responsibility in the administration of the ESOP.

25.     **Defendant BDO Board of Directors** and its members (collectively "the Board")

administer the ESOP and have power to delegate administrative responsibility to committees.

26.     Under the governing document for the ESOP, the Board (i) is named as a fiduciary;

(ii) by resolution of the Board or other Board action takes all actions required or permitted to be

taken by BDO with respect to the ESOP; (iii) assumes the power, duties and responsibilities of the Plan Administrator, which is BDO; and (iv) has the power to appoint and remove the ESOP trustee.

27.     Thus, the Board and BDO have all discretionary power and authority over the ESOP and its operations, unless the Board or Company expressly assigned or delegated any such authority in writing to another individual or entity consistent with the requirements under ERISA 29 U.S.C. § 1102. The Board has complete authority and discretion to interpret and resolve any ambiguities in the Plan terms, make factual determinations and benefit eligibility determinations, review and decide benefit claims, maintain records, establish rules and procedures for Plan administration, and contract for outside services for the Plan. BDO and its Board have all discretionary power and authority over the ESOP and its operations, unless the Board or Company delegated any such authority in writing to another individual or entity consistent with the requirements under ERISA 29 U.S.C. § 1102.

> a.     **Wayne Berson** is the Chief Executive Officer of BDO and Chairman of the Board. Defendant Berson has been CEO of BDO since 2012 and was a key architect of the Transaction. He operates out of the Company's Potomac, MD office.

28.     The Board selected and appointed State Street to serve as the independent trustee of the ESOP to represent the ESOP's interest in the Transaction. State Street, on behalf of the ESOP, approved the ESOP's purchase of approximately 42% of BDO stock for $1.24 billion, which was greater than fair market value. State Street, on behalf of the ESOP, also approved all Transaction terms, including the ESOP's entering into the Acquisition Loan, and the Company guarantee of the borrowed amount.

29.     The Board also selected and appointed the BDO ESOP Trustees to serve as the

ESOP's trustee after the Transaction.

30.    The Board is a fiduciary of the ESOP within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), because, *inter alia,* it exercised discretionary authority respecting management of the ESOP; exercised authority or control respecting the management of the ESOP's assets; and/or has discretionary authority or discretionary responsibility in the administration of the ESOP.

31.    Because the Board appointed and replaced State Street, and appointed the BDO ESOP Trustees, they had a duty to monitor their appointees. ERISA requires that, "[a]t reasonable intervals the performance of trustees and other fiduciaries should be reviewed by the appointing fiduciary in such manner as may be reasonably expected to ensure that their performance has been in compliance with the terms of the plan and statutory standards, and satisfies the needs of the plan." 29 C.F.R. § 2509.75-8, FR-17.

32.    **Defendant BDO ESOP Trustees** is a committee of BDO executives and Board members that have been appointed by the Company to serve as the ESOP's Trustee.

33.    The ESOP Trustees selected and appointed by the Board include the following individuals:

    a.    **Catherine Moy** is the Company's Chief People Officer and serves as an Executive Team member. Defendant Moy has been employed by BDO since July 2002 and operates out of the Company's Boston, MA office.

    b.    **Mark Ellenbogen** has been the Company's Chief Operating Officer since June 6, 2024 and serves as an Executive Team member. Defendant Ellenbogen has been employed by BDO since 1997 and was previously a member of the Board. As a Board member, Mark chaired its Governance Committee and was an instrumental figure in the

7

establishment of the ESOP. Defendant Ellenbogen operates out of the Company's Potomac, MD office.

c.    **Matthew K. Becker** is the Company's National Managing Principal of Tax and serves as an Executive Team member. Defendant Becker has been employed by BDO since June 2002 and operates out of the Company's Grand Rapids, MI office. Defendant Becker previously served as Chair of the Company's Board of Directors.

d.    **William Eisig** is the Company's National Managing Principal of Assurance and served as an Executive Team member. Defendant Eisig has been employed by BDO since September 2001 and operates out of the Company's Potomac, MD office.

e.    **Patrick Donoghue** is the Company's National Managing Principal of Corporate Finance and Transaction Advisory Services. Defendant Donoghue has been employed by BDO since July 2014 and operates out of the Company's New York, NY office.

f.    **Stephen R. Ferrara** was the Company's Chief Operating Officer until June 6, 2024 and served as an Executive Team member. Defendant Ferrara was employed by BDO beginning in 1991 and operated out of the Company's Chicago, IL office.

34.    Pursuant to ERISA § 403(a), 29 U.S.C. § 1103(a), the assets of every plan must be held in trust by a trustee who has exclusive authority and discretion to manage and control the assets of the plan. As such, the ESOP Trustees, as the Plan's trustee, are fiduciaries of the ESOP within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21).

### III.    FACTUAL ALLEGATIONS

#### A.    The Company

35.    BDO is a U.S. division of BDO Global, an international network of public accounting, tax and advisory firms which perform professional services. BDO Global's headquarters are located in Brussels, Belgium.

36.    BDO is the fifth largest accounting firm in the U.S. and maintains operations in most states, including offices in Massachusetts, Maryland, and Michigan.

37.    Prior to July 1, 2023, BDO was structured as a limited liability partnership ("LLP").

38.    Under the LLP structure, the Company had two classes of partners: variable share and fixed share partners.

39.    The Transaction could not occur while BDO was structured as a limited liability partnership. A change in BDO's corporate form required a vote by the Company's shareholders.

40.    In March 2023, BDO's partnership received an email from Company management about a corporate change. Although this email provided reasons for the corporate change, a potential ESOP transaction was not among them. Fixed share partners were informed that they would be treated equally to variable share partners following the corporate change.

41.    BDO's partners affirmatively voted to convert BDO from an LLP to a Professional Association (P.A.) on or around April 30, 2023.

42.    On July 1, 2023, BDO changed its corporate form to a P.A.

43.    In August 2023, the Company's management then emailed the Company's partners to advise them that BDO's corporate form would again change from a P.A. to a P.C. The Company's management disclosed the contemplated ESOP transaction to the Company's partnership at this time.

44.    Effective August 30, 2023, BDO USA, P.C. was deemed to be a stock corporation

in Virginia.

45.    Defendant Ferrara was the incorporator for each of these changes in BDO's corporate form.

46.    Effective August 30, 2023, BDO amended its Articles of Incorporation. Under the amended Articles of Incorporation, BDO was authorized to issue two classes of capital stock, including common stock and preferred stock.

47.    BDO was authorized to issue 100,000,000 shares of common stock and 2,500,000 shares of preferred stock.

48.    The amended Articles of Incorporation condition the ability of common stockholders to elect BDO's board members and receive dividends on the rights of the holders of preferred stock.

49.    The amended Articles of Incorporation further require BDO to indemnify its directors and officers to the fullest extent authorized or permitted by applicable law.

50.    Defendants created an ESOP governance structure that provided them control and authority over the ESOP such as retaining the power to vote the ESOP's shares in BDO, including voting on members of the BDO Board.

**B.    The BDO USA Employee Stock Ownership Plan**

51.    On August 31, 2023, the Company established the ESOP as a captive buyer for shares of certain high-ranking partners of the Company.

52.    The ESOP is a pension plan within the meaning of § 3(2), 29 U.S.C. § 1002(2), and is subject to ERISA pursuant to ERISA § 4(a)(1), 29 U.S.C. § 1003(a)(1).

53.    The ESOP is an individual account plan, or defined contribution plan, under which a separate individual account was/is established for each participant including Plaintiff Taylor. Employees of BDO participate in the ESOP.

54.    As an ERISA-protected ESOP, employer contributions made on behalf of employees are invested in the employer's stock. ERISA § 407(d)(6), 29 U.S.C. § 1107(d)(6); *see also* 29 C.F.R. § 2550.407d–6 (definition of the term "employee stock ownership plan").

55.    The Plan is identified in Department of Labor filings as a "Leveraged ESOP," and it is designed to invest in the employer securities of BDO.

56.    The Company intended the ESOP to qualify for favorable tax treatment and sought favorable tax treatment from the IRS since the ESOP's creation.

57.    The employer contributions, invested in employer stock, are part of employee compensation and comprise an important part of employee retirement savings. In other words, the employee contributions made to the ESOP are part of their compensation package. In fact, around the time the ESOP Transaction occurred, BDO partners were told that BDO was replacing the Company's cash balance pension benefits program with the ESOP and indicated that keeping that cash balance program was not sustainable for BDO long term. These statements further confirm that the ESOP contributions are part of employees' compensation.

58.    Not surprisingly, courts have long recognized that an "ESOP's assets [are] part of the overall benefits and compensation package offered to employees who participate[] in the Plan," and that "[e]mployee benefits are not a mere gratuity, but a form of deferred wages." *Neil v. Zell*, 767 F. Supp. 2d 933, 943 (N.D. Ill. 2011) (quoting *Reich v. Valley Nat. Bank of Ariz.*, 837 F. Supp. 1259, 1286-87 (S.D.N.Y. 1993)).

59.    The price the ESOP paid for shares of the Company's company stock is a material retirement decision that has long-term effects on employees' retirement security. Overpaying for Company stock in an ESOP transaction causes the participants to receive fewer pension benefits than they are entitled to by law. *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 444 (6th Cir. 2002)

("Defendants, by arguing that the initial price of the stock does not matter, essentially ignore the fact that the money paid for the Hall Holding stock was a form of deferred compensation for the participants in the Hall Chemical ESOP. However, because the Hall Chemical ESOP overpaid for the shares of Hall Holding stock, it suffered a loss.").

60.    Because the ESOP is fully leveraged, under the terms of the ESOP, employer contributions made to the ESOP are used to pay down the Acquisition Loan.

61.    Under the terms of the ESOP, shares are released for allocation into participant accounts as the principal on the Acquisition Loan is paid down. Employer contributions that are used to pay the interest expense of an Acquisition Loan do not result in shares allocated to participant accounts. As such, all else equal, the higher the rate of interest on the Acquisition Loan, the fewer the shares allocated to participant accounts in a given year.

62.    If the interest on the ESOP transaction loan is excessive, ESOP participants (including Plaintiff Taylor) receive less value in their accounts because, among other things, employer contributions are used to pay excessive interest rather than to allocate shares to the ESOP accounts.

63.    Under the terms of the ESOP, participants (including Plaintiff) are entitled to an allocation of Company stock to their individual accounts generally based on the ratio of the participant's compensation to the total compensation of all participants in the respective year. The amount of employer contributions the participants receive are not dependent on the price of value of Company stock.

64.    For example, in 2023, employer contributions to the ESOP were $119.5 million, which constituted part of employee compensation, but 35% of the contributions were used to pay unreasonable amounts of interest reflecting outstanding debt for just four (4) out of 12 months.

Going forward, due to the unreasonably high interest rate, the ESOP would be required to pay $145 million each year just on the interest, which would greatly reduce the amount of retirement contributions deposited into employee accounts.

### C. ESOP Transaction

65.    On August 31, 2023, the ESOP purchased approximately 42% of BDO's outstanding common stock for $1,242,025,992 (hereinafter, "the ESOP Transaction" or the "Transaction"). This translates to a purchase price of approximately $100 per share of Company stock.

66.    The shares purchased by the ESOP were held by the Company's principals, with the vast majority being held by former variable share partners. Because members of the Board and ESOP Trustees held substantial ownership interests before the ESOP Transaction, they were enriched by the Transaction and benefited from an inflated valuation.

67.    The remaining portion of BDO's common stock was retained by certain of the Company's principals.

68.    In addition, certain selling shareholders received warrants in connection with the Transaction. Warrants give the holder the right to purchase additional stock from the Company at a pre-set price, known as the strike price. Based on the best information available to Plaintiff, the strike price for these warrants was $58/share, which meant they were "in the money" at the time of the Transaction.

69.    The Company engaged Stout Risius Ross, LLC ("SRR"), a valuation advisor, to advise it throughout the Transaction. SRR served as the exclusive financial advisor to BDO and led the ESOP structuring, financing process, and execution on behalf of the company. Both SRR and Aziz El-Tahch—who led the work for SRR on this Transaction—have been the subject of litigation because ESOP sale price valuations they performed in other cases allegedly exceeded

fair market value.

70.     The Company, acting through the Board, also selected and appointed State Street to serve as an independent trustee for the ESOP. As trustee for the ESOP, State Street was required to (among other things) perform due diligence into BDO's business and, along with other ESOP fiduciaries such as BDO and the Board, ensure that the valuation of BDO stock was based on accurate and reasonable information and that the ESOP paid no more than fair market value ("FMV") for the Company's stock.

71.     Based on the best information available to Plaintiff, the Company agreed to indemnify State Street for its role in the ESOP Transaction.

72.     State Street engaged Duff & Phelps as the valuation advisor to assist in valuing BDO's stock.

73.     In order for the Transaction to occur, the Company's principals had to affirmatively vote to approve the sale of Company shares to the ESOP.

74.     The Company's Board and executives exerted pressure on Company principals to approve the sale.

75.     Defendants called an emergency meeting in Orlando, FL in August 2023, which lasted two days.

76.     Defendants Berson, Ferrara, Moy, and Ellenbogen, among others, presented to the meeting attendees about the contemplated ESOP transaction. Representatives from Apollo and the ESOP's current recordkeeper, Principal, were also present. But, based on the best information available to Plaintiff, State Street was not.

77.     During this meeting, principals were told that the ESOP Transaction would provide them with more wealth from the Company than they currently received from the Company.

78.     Defendant Berson told attendees that "you're either on the bus or off the bus." Defendant Berson also personally called principals following the meeting to pressure them to vote to complete the ESOP Transaction, which would benefit him enormously.

79.     Under the P.A. corporate form, the fixed share partners had negligible voting power in the matter. As such, they were beholden to the variable share partners who were being enriched by the ESOP Transaction.

80.     Following the Transaction, the Board selected and appointed several BDO executives as ESOP Trustees to serve in State Street's place. State Street continues to serve in a consulting role to the ESOP Trustees.

81.     The ESOP did not have any assets prior to the Transaction to purchase BDO stock. To allow the ESOP to purchase BDO stock, the Company, aided by SRR, entered into the Acquisition Loan with Apollo and made a corresponding loan of that money to the ESOP.

82.     The ESOP's Form 5500 filed with the Department of Labor for the year ending December 31, 2023 disclosed that the ESOP was carrying $1.28 billion in liabilities. The Acquisition Loan placed an enormous debt burden on BDO and the ESOP.

83.     Based on the best information available to Plaintiff, the Acquisition Loan carried a floating interest rate based on the Secured Overnight Financing Rate plus 6%. As of December 31, 2023, this resulted in an interest rate of 11.36%.

84.     BDO guaranteed and is required to make contributions to the ESOP sufficient to pay all loan payments due, thereby reducing BDO's future cash flows by the amount necessary to service the ESOP's Transaction debt.

85.     The Company stock held by the ESOP has substantially declined in value from what the ESOP and its participants paid for it.

86.     The Form 5500 for the ESOP for the period ending December 31, 2023 reported that the Company stock was worth $796,014,458.00 and that the Company stock had depreciated by $446,011,534 during the year.

87.     As of December 31, 2023, the Company stock purchased by the ESOP was worth $64.09 per share.

88.     As of December 31, 2024, the Company stock purchased by the ESOP was worth $65.27 per share.

89.     Based on the best information available to Plaintiff, since the Transaction, $305.4 million of the Acquisition Loan has been paid down. If the Company had performed in-line with Defendants' representations to State Street, the Company stock to would be worth at least $75.41 per share as of December 31, 2024.

90.     As such, as of December 31, 2024, Company stock was worth at least $126 million *less* than what it would have been had the Company met its targets, notwithstanding the Acquisition Debt. As a result, Plaintiff Taylor's ESOP account had lost at least $1,465 in value due to this foreseeable underperformance as of December 31, 2024.  This loss persists today.

**D.    The Transaction Price Exceeded Fair Market Value**

91.     The purchase price that the ESOP paid, approximately $100 per share or $1.24 billion in total, far exceeded the fair market value of the purchased shares.

92.     The BDO stock valuation State Street relied upon to justify the $1.24 million purchase price was flawed. In particular, the stock valuation was based on inflated earnings and unreasonable projections, and excluded material negative facts relevant to the valuation.

93.     CEO Wayne Berson, members of the Board, and other high-ranking executives of the Company had been planning the ESOP for approximately two years before it closed.

94.     Based on the best information available to Plaintiff, the Company's executive team,

including members of the Board and ESOP Trustees, were responsible for preparing the internal financial information about the Company's performance that State Street used to value the Company.

95.    The Company's executive team suffered from a conflict of interest in connection with the Transaction. The Company's executives had a substantial ownership interest in the Company prior to the Transaction. As a result, any increase in the stock valuation directly inured to their benefit.

96.    Aware that their personal fortunes were tied to the valuation the ESOP paid for Company stock, the Company's leadership—including the Board—designed and implemented a campaign to artificially increase revenues and decrease costs by any means necessary.

97.    Starting in at least 2022, Company executives started looking for ways to increase short-term revenue growth and profitability to artificially inflate the Company's value so that State Street would approve a higher Transaction price.

98.    On January 12, 2022, Company executives sent an email to all the partners directing them to raise the price on every engagement by 10%. Then, on September 13, 2022, Company executives sent another email, which directed that the prices for all their engagements should be raised 15% instead. These changes were made to immediately improve revenue without regard to the impact it would have on demand for BDO's services after the Transaction closed.

99.    Since the Transaction closed, a clearer picture of Defendants' campaign to artificially inflate BDO's revenues has emerged.

               1.    <u>BDO Provided Inflated Revenues to Value the Company's Stock.</u>

100.    The prior Tax Office Managing Partner of BDO's Norfolk, Virginia office disclosed that BDO's leadership had directed BDO's branch offices to manipulate revenues to ensure that they met BDO's monthly forecasts prior to the first quarter of 2023.

101.     The prior Tax Office Managing Partner chose to end his career at BDO due to ethical concerns he had about this revenue manipulation—concerns that he made known to Defendants Berson, Ellenbogen, Becker, and others during the first quarter of 2023.[1]

102.     A Healthcare Transaction Advisory Services National Practice Leader and Tax Practice Leader also disclosed pressure from the Company to overinflate revenues in advance of the Transaction date.[2]

103.     Employees were also pressured to inflate revenues by manipulating and/or mis-attributing client "credits" as revenue. Credits are either prepayments (e.g., retainer amounts) or amounts paid more than the actual worked performed that either must be refunded to the client or applied against future work.

104.     Based on the best information available to Plaintiff, BDO's revenue recognition process was modified in the lead-up to the Transaction to release client credits into reported revenue in order to achieve targets the Company set to support the desired Transaction price.

105.     A former Managing Director in BDO's unclaimed property practice in New York also disclosed fraudulent billing practices he observed in the second quarter of 2023, that included recouping "miscellaneous expenses" and expenses for internal meetings and conferences by inflating the number of hours billed to clients by an amount needed to recoup such expense.[3]

106.     Based on the best information available to Plaintiff, BDO's pressure campaign caused both historic and projected earnings to be inflated.

---

[1] *McKenzie v. BDO USA, P.C.*, No. 2025-0264, ECF 1 ¶¶ 23-28 (Del. Ch. Mar. 10, 2025).

[2] *BDO USA, P.C., v. Ankura Consulting Grp., LLC*, No. 3:24-cv-00179, ECF 65 at 50 (E.D. Va. Sept. 16, 2024); *BDO USA, P.C., v. Crandell,* No. 3:24-cv-00012, ECF 31 at 35 (E.D. Va. Apr. 25, 2024).

[3] *Lupu v. BDO USA, P.C.*, No. 1:24-cv-08767, ECF 1 ¶¶ 17-26 (S.D.N.Y. Nov. 18, 2024).

107.    During the time period in which BDO employees were pressured to inflate revenues, the Company experienced a marked increase in revenue growth.

108.    For example, in the month prior to the ESOP Transaction (July 6, 2023), the Company reported a year-over-year revenue increase of 13.3% during the fiscal year ending April 30, 2023.

109.    Similarly, on July 12, 2022, the Company reported a year-over-year revenue increase of nearly 25% during the fiscal year ending April 30, 2022.

110.    Defendants used this inflated revenue growth to support a forecast revenue growth assumption of approximately 7% in the forecasts they provided to State Street.

111.    BDO executives, including Defendant Ferrara, touted Defendants' forecasts as conservative because a 7% assumption was below the Company's recent revenue growth levels.

112.    Because the Company's recent financial performance was manipulated, Defendants wrongly portrayed the forecasts provided to State Street as reasonable.

113.    In the lead up to the Transaction, the Board and senior executives set budgets for revenue and expenses that were unsupported by the Company's historical operations and unobtainable. These revenue expectations were substantially higher and unrealistic for several practice groups, particularly in light of cost-cutting measures the Company was implementing.

114.    The private valuation that State Street performed to determine whether to approve the Transaction at the $100/share price used various valuation methodologies to determine whether that price was fair market value. The accuracy of each valuation methodology applied depended on accuracy of the revenue and profitability figures input, among other things. All else equal, the higher the revenue and profitability used to value a company, the higher the resulting value. As such, the inflated financial information Defendants provided to State Street resulted in an inflated

valuation.

115.     The Company's revenue growth slowed following the Transaction and missed the forecasts provided to State Street.

116.     On March 5, 2025, the Company reported revenue of $2.885 billion. This represents a year-over-year revenue increase of only 2.21%, which was below the rate of inflation during 2024. Had the Company achieved a 7% revenue growth assumption, the Company's revenue would have been $3.02 billion.

117.     Based on the best information available to Plaintiff, had Defendants prepared forecasts based on accurate, organic revenue growth expectations, the ESOP would have paid at least $60,000,000 less for the Company Stock; this translates to $4.83 less per share.

118.     Had Defendants provided accurate, honest and complete information about BDO's operations, the ESOP would not have paid a purchase price in excess of fair market value.

119.     Because the ESOP overpaid for Company stock because of inflated revenue assumptions, fewer shares were allocated to Plaintiff's account than would have otherwise occurred. Based on the best information available to Plaintiff, at least seven (7) additional shares would have been allocated to Plaintiff's account by 2024 if realistic revenue forecasts were used to value the Company stock. This deprived Plaintiff of at least $450 in retirement benefits in his account.

2.     <u>The Quality of BDO's Services was Deteriorating in the Run-up to the Transaction, which was not adequately disclosed to State Street.</u>

120.     During the period leading into the Transaction, the quality of BDO's audit work also deteriorated.

121.     Each year, the PCAOB releases an inspection report for 14 U.S. accounting firms. BDO is among the 14 accounting firms reviewed by the PCAOB.

122.    In 2021, 2022, and 2023, the PCAOB's review found that BDO had the highest number of Part I.A deficiencies among the reviewed accounting firms.

123.    PCAOB defines Part I.A deficiencies as "[d]efficiencies in reviewed issuer audit that were of such significance that the Board believes that the firm, at the time it issued its audit report, had not obtained sufficient appropriate audit evidence to support its opinion on the issuer's financial statements and/or ICFR [Internal Control over Financial Reporting]."[4]

124.    As the following tables[5] illustrate, the Part I.A deficiencies the PCAOB observed also increased substantially during the years leading up to the Transaction, from 53% in 2021 to 86% in 2023.

| TABLE 2 | | | |
|---|---|---|---|
| 2021 INSPECTIONS OF U.S. AFFILIATE OF GLOBAL NETWORKS (Reports are dated November 4, 2022, except EY, which is dated November 21, 2022, and were released on December 19, 2022) | | | |
| Firm | Engagements Inspected | Deficient Engagements Described in Part I.A | Percentage of Inspected Engagements with Deficiencies |
| BDO | 30 | 16 | 53% |
| Deloitte & Touche | 54 | 7 | 13% |
| Ernst & Young | 56 | 12 | 21% |
| Grant Thornton | 31 | 7 | 23% |
| KPMG | 54 | 14 | 26% |
| PwC | 56 | 2 | 4% |
| Global Network Firm Totals | 281 | 58 | |
| Global Network Firm Averages | 47 | 10 | 21% |

---

[4] PCAOB Inspection Procedures: What Does the PCAOB Inspect and How Are Inspections Conducted?, Public Accounting Oversight Board, https://pcaobus.org/oversight/inspections/inspection-procedures (last visited Jan. 17, 2025).

[5] 2023 PCAOB Large Firm Inspection Reports, Auditor Comm. and Auditor Oversight Update (Aug. 26, 2024), https://www.auditupdate.com/post/2023-pcaob-large-firm-inspection-reports; 2022 PCAOB Large Firm Inspection Reports – Updated, Auditor Comm. and Auditor Oversight Update (May 31. 2024), https://www.auditupdate.com/post/2022-pcaob-large-firm-inspection-reports-updated; 2021 PCAOB Large Firm Inspection Reports, Auditor Comm. and Auditor Oversight Update (Dec. 29, 2024), https://www.auditupdate.com/post/2021-pcaob-large-firm-inspection-reports.

TABLE 1

2022 INSPECTIONS OF U.S. AFFILIATE OF GLOBAL NETWORKS
(Reports are dated between November 7, 2023, and December 20, 2023,
and were released on February 28, 2024; unredacted KPMG report released on April 26, 2024)

| Firm | Engagements Inspected | Deficient Engagements Described in Part I.A | Percentage of Inspected Engagements with Deficiencies |
|---|---|---|---|
| BDO | 29 | 19 | 66% |
| Deloitte & Touche | 53 | 9 | 17% |
| Ernst & Young | 54 | 25 | 46% |
| Grant Thornton | 26 | 8 | 31% |
| KPMG | 54 | 16 | 30% |
| PwC | 54 | 5 | 9% |
| Global Network Firm Totals | 270 | 82 | |
| Global Network Firm Averages | 45 | 14 | 30% |

TABLE 1

2023 INSPECTIONS OF U.S. AFFILIATE OF GLOBAL NETWORKS
(Reports are dated between May 23, 2024, and June 20, 2024,
and were released on August 15, 2024)

| Firm | Engagements Inspected | Deficient Engagements Described in Part I.A | Percentage of Inspected Engagements with Deficiencies |
|---|---|---|---|
| BDO | 29 | 25 | 86% |
| Deloitte & Touche | 56 | 12 | 21% |
| Ernst & Young | 59 | 22 | 37% |
| Grant Thornton | 28 | 15 | 54% |
| KPMG | 58 | 15 | 26% |
| PwC | 57 | 10 | 18% |
| Global Network Firm Totals | 287 | 99 | |
| Global Network Firm Averages | 48 | 17 | 34% |

125.    These risks associated with BDO's poor audit quality were known to BDO and its Board prior to the Transaction. Defendants should have fully disclosed this information to State Street but, based on the best information available to Plaintiff, did not because doing so would have negatively affected the ESOP deal valuation.

126.    However, after the Transaction closed, the truth about BDO's lax audit standards became public and resulted in substantial fines on the Company. For example, on September 26, 2023, the PCAOB announced that it was sanctioning BDO and partners Keven Olvera and Michael Musick over $2 million for violations of PCAOB rules and audit standards. The PCAOB found that BDO and Keven Olvera (BDO's audit partner) failed to properly evaluate three significant

estimates used to value substantially all its client-related revenue and accounts receivable. This and another audit failure occurred despite BDO, Olvera, and Musick encountering several red flags that called into question the reasonableness of the estimates. BDO's sanctionable conduct occurred prior to the ESOP Transaction but the sanctions and report addressing the conduct did not become public until a month after the ESOP Transaction occurred. Based on the best information available to Plaintiffs, this sanctionable conduct by BDO and its audit partners was not disclosed to State Street prior to the Transaction close.

127.    Likewise, other disciplinary actions by the PCAOB against BDO came to light in the year after the ESOP Transaction, but the sanctionable conduct occurred beforehand. In 2024, the PCAOB announced that it was settling a disciplinary order with BDO and that BDO would pay monetary sanctions. In June 2024, the PCAOB reported that BDO was being fined for not complying with PCAOB reporting requirements, namely the failure to timely disclose two reportable events that occurred in 2023. The reportable events occurred on April 11, 2023 and May 11, 2023 respectively, and PCAOB disclosure rules required BDO to report these negative events within 30 days of their occurrence. Thus, both events should have been reported **before** the ESOP Transaction closed. However, in violation of PCAOB rules, both events were not reported until 2024.

128.    Additional PCAOB reports in January of 2025 revealed that in 2023, BDO Canada had deficiencies in two out of three audits inspected by the PCAOB in the United States.

129.    In fact, in 2024, Senators Elizabeth Warren and Sheldon Whitehouse sent a letter to the PCAOB and "zeroed in on BDO, the sixth-largest accounting firm in the US, where almost

all audits examined by inspectors last year were found to have flaws."[6] The letter from Senators Warren and Whitehouse asked PCAOB whether "repeat offenders" are deterred by potential fines that they said are typically "a drop in the bucket" compared with firm revenues. The *Financial Times* reported on October 10, 2024 that "Elizabeth Warrant criticises [sic] accounting watchdog over BDO audit failures." The same article noted that "PCAOB inspectors consistently find more flaws in audits by BDO than any other large accounting firm." The *Financial Times* reported that in response to Senator Warren's letter "BDO said it is investing in improving its audit-quality scores and has built up external oversight of its processes."

130.    The price that the ESOP paid for BDO shares should have been, but was not, adequately reduced to reflect the reputational harm and direct financial harm caused by BDO's worsening performance because public condemnation did not begin until 2024—after BDO's 2023 deficiency rate peaked at 86%.



[6] Stephen Foley, Elizabeth Warren criticises accounting watchdog over BDO audit failures, Fin. Times (Oct. 10, 2024), https://www.ft.com/content/ed27787b-b3df-41cb-8065-35c84074c929.

3.    The Debt Burden the ESOP Transaction Imposed on the Company has Strained its Solvency.

131.    Apollo assigned a high probability of default to the enormous loan it provided to fund the ESOP Transaction.

132.    Apollo allocated the Acquisition Loan to certain Apollo-affiliated investment vehicles, including the Apollo Debt Solutions BDC.

133.    The Apollo Debt Solutions BDC filings with the Securities and Exchange Commission disclose that "[m]ost of the debt instruments we invest in are unrated or rated below investment grade, which is often an indication of size, credit worthiness and speculative nature relative to the capacity of the borrower to pay interest and principal. Generally, if our unrated investments were rated, they would be rated below investment grade. These securities, which are often referred to as 'junk' or 'high yield', have predominantly speculative characteristics with respect to the issuer's capacity to pay interest and repay principal. They may also be difficult to value and are illiquid."

134.    The rate of interest charged for the Acquisition Loan exceeded interest rate benchmarks for both junk and unsecured lending.

135.    The ICE BofA US High Yield Index is an index which tracks the performance of US dollar denominated below investment grade rated corporate debt publicly issued in the US domestic market. To qualify for inclusion in the index, securities must have a below investment grade rating (based on an average of Moody's, S&P, and Fitch) and an investment grade rated country of risk (based on an average of Moody's, S&P, and Fitch foreign currency long term sovereign debt ratings).

136.    As of December 31, 2023, the ICE BofA US High Yield Index Effective Yield was 7.39%. In contrast, the interest rate for the Acquisition Loan was 11.36% at that same time.

137.    The U.S. Prime Rate is the base rate on corporate loans posted by at least 70% of the 10 largest U.S. banks. It is used as a benchmark to determine the rate that banks will charge for business loans. As of December 31, 2023, the Prime Rate was 8.5%. Had Defendants caused the ESOP to incur an acquisition loan in line with the Prime Rate rather than SOFR + 6%, the ESOP and its participants would have saved more than $30 million in interest payments per year.

138.    In the last quarter of 2023 after the ESOP Transaction, the ESOP incurred $42 million in interest expense. On an annualized basis, this is a $126 million interest expense. Employer contributions made for Plaintiff's benefit were used to pay this expense.

139.    Because such a large portion of the employer contributions were used to pay an interest expense, fewer shares were allocated to Plaintiff's account than if a reasonable interest rate was used to fund the Transaction.

140.    Based on the best information available to Plaintiff, his account would have been allocated approximately 10 additional shares of Company stock by 2024 if the ESOP acquisition loan carried a 7.39% interest rate. This under-allocation of shares as result of excessive interest payments deprived Plaintiff of at least $650 in retirement benefits.

141.    Defendants were aware that servicing the Acquisition Loan would put enormous financial strain on the Company, both risking its solvency and diverting resources needed to grow to loan repayment.

142.    Board members informed employees of BDO at an August 2023 partners meeting in Orlando—in which all Defendants participated—that the Company was terminating the BDO USA, LLP Cash Balance Plan because its expense was not sustainable in the long term and could bankrupt the Company.

143.    Based on the best information available to Plaintiff, the BDO USA, LLP Cash

Balance Plan would have cost the Company approximately $600 million over the life of that cash balance plan.

144.    On September 29, 2023, the Board approved the termination of the BDO USA, LLP Cash Balance Plan effective December 31, 2023.

145.    The ESOP and the $1.24 billion loan imposed a far greater expense and impact on the Company's cash flow than the BDO USA, LLP Cash Balance Plan.

146.    In order to remain solvent, the Company has aggressively cut staff, cut employee benefits, and set unrealistic revenue and expense targets for the Company's employees.

147.    The Company laid off high-level employees and did not pay partners bonuses as a way to save money following the Transaction.

148.    The Company underwent several rounds of layoffs starting in in 2023 and pushed National Practice Leaders into retirement.

149.    The Defendants' scramble to meet the unrealistic expectations they set for State Street and remain solvent has continued since the Transaction.

150.    The detrimental impact the Acquisition Loan would have on the Company's ability to retain employees was knowable in advance of the Transaction.

151.    The forecasts that Defendants provided to State Street did not properly account for the impact that employee attrition and lowered compensation would have on the Company's ability to grow and retain clients.

        4.    <u>BDO and the Board Defendants Failed to Monitor State Street and Provide It with Accurate Information.</u>

152.    In approving the ESOP Transaction, State Street relied on the accuracy and reasonableness of BDO's historical and forecasted income statements and financial condition.

153.    Based on the best information available to Plaintiff, BDO provided a management

representation letter to State Street attesting to the accuracy and reasonableness of the financial information that BDO and its Board provided to State Street shortly before the ESOP Transaction. BDO and the Board knew that the information it was attesting to in the management representation letter would be used by State Street to value Company stock and approve the Transaction.

154. BDO and the Board did not disclose to State Street that its historical financial information or projected financial information was manipulated to increase the value of Company stock.

155. BDO and the Board did not disclose to State Street the extent of the Company's exposure from partners with claims against the Company as a result of fiduciary breaches.

156. As an independent fiduciary, State Street did not have the authority necessary to audit or otherwise validate the sources of BDO's revenue or liabilities.

157. Because BDO and the Board was aware that State Street was relying on inaccurate financial information to value that Company, it was obligated, but failed to, prevent the defects in the resulting valuation by, *inter alia*, restating the financial information State Street had or otherwise disclosing Defendants' conduct in the leadup to the Transaction.

158. Because the BDO ESOP Trustees (which consisted of high-ranking executives and Board members) were aware that the Company's stock was valued using inflated financial information, it was obligated, but failed to, remedy the defects in the resulting valuation by, *inter alia*, clawing back excess value paid by the ESOP for Company stock.

5. <u>The ESOP Did Not Obtain Control over the Company or its Cash Flows. This Substantially Impairs the Marketability of the ESOP's Shares.</u>

159. The approved ESOP Transaction sale price also failed to fully account for the fact that the Company's Executive team and existing Board of Directors retained control over the Company.

160.    Because the ESOP holds a minority interest in the Company, it is unable to select the Company's management or exercise any control over its cash flows.

161.    Despite the sale to the ESOP, BDO's Board of Directors and management team continue to guide the firm's strategy and operations.

162.    Moreover, because the Articles of Incorporation condition the Company's dividend policy on preferred stock rights, the ESOP's ability to share in a proportionate share of the Company's profits may be impaired.

163.    After the ESOP Transaction, Defendants retained the same level of control over BDO as they had beforehand because they installed themselves as ESOP Trustees with the power to vote the ESOP's shares in the Company.

164.    The price an investor is willing to pay for a company's equity is materially affected by the degree to which the investor's equity interest will give the investor control over the company.

165.    Non-controlling interests trade at a substantial discount (generally over 20% and as much as 40%) relative to a controlling interest in a company.

166.    The price that the ESOP paid should have been, but was not, adequately reduced to discount for lack of control, given that the ESOP did not actually obtain operational control over the Company, its cash flows, or its Board of Directors.

167.    The ESOP's ability to sell its shares of BDO is materially impaired given the limited and conditional rights afforded to those shares.

168.    Shares that are not readily marketable trade at a discount far in excess of 10%.

169.    Based on the best information available to Plaintiff, the valuation also exceeded fair market value because it did not adequately discount for the share's lack of marketability. Rather,

the valuation failed to consider the ESOP's inability to readily sell its shares to a third-party as a result of participants' ability to put their shares on the Company.

## IV.    PLAINTIFF SEEKS PLAN-WIDE RELIEF

170.    Plaintiff brings these claims for plan-wide relief pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), and as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b), on behalf of the following Class:[7]

> All participants in the BDO ESOP on or after August 31, 2023 who vested under the terms of the ESOP, and those participants' beneficiaries, excluding Defendants and their immediate family members; any fiduciary of the Plan; the officers and directors of BDO or of any entity in which a Defendant has a controlling interest; and legal representatives, successors, and assigns of any such excluded persons.

171.    ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), provides that "[a] civil action may be brought [. . .] by a participant, beneficiary or fiduciary for appropriate relief under [ERISA section 409, 29 U.S.C.] section 1109[.]". In turn, ERISA section 409(a) states that any fiduciary with respect to a plan who breaches "any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter *shall be personally liable to make good to such plan any losses to the plan resulting from each such breach*[.]" 29 U.S.C. § 1109(a) (emphasis added).

172.    The Supreme Court has explained that Plaintiff's ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), claims are necessarily "brought in a representative capacity on behalf of the plan as a whole." *Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 142 n.9 (1985). In other words, the relief Plaintiff seeks pursuant to § 1132(a)(2) "inures to the benefit of the plan *as a whole.*" *Id.* at 140 (emphasis added).

173.    In *LaRue v. DeWolff, Boberg, and Associates, Inc.*, 552 U.S. 248 (2008), which

---

[7] Plaintiff reserves the right to revise the class definition, and to propose other or additional classes in subsequent pleadings or their motion for class certification, after discovery in this action.

involved a defined contribution plan like the BDO ESOP, the Supreme Court further explained that "[ERISA] §§ 409(a) and 502(a)(2) [29 U.S.C. §§ 1109 and 1132(a)(2)] permit recovery of *all* plan losses caused by a fiduciary breach." *Id.* at 261 (Thomas, J., concurring).

174. **Numerosity.** The Class satisfies the numerosity requirement because it is composed of thousands of persons. The Plan currently has approximately 10,000 participants. The number of Class members is so large that joinder of all its members is impracticable.

175. **Commonality.** As to the members of the Class, this case presents numerous common questions of law and fact, among them:

a. Whether BDO and the Board engaged in a prudent and loyal investigation of the proposed purchase of shares of BDO stock by the ESOP in the Transaction, including whether the Transaction's terms and price were fair and in the best interest of ESOP participants;

b. Whether BDO and the Board provided inflated financial metrics of BDO revenues and earnings for purposes of assessing the value of BDO stock;

c. Whether BDO and the Board failed to properly consider BDO's guarantee of the ESOP's $1.24 billion loan, which would be classified as debt on BDO's balance sheet and a charge to shareholders' equity;

d. Whether BDO and the Board failed to properly consider the reduced cash flow the Company would suffer due to its obligation to make contributions to the ESOP in an amount sufficient to cover the ESOP's loan payments;

e. Whether Company executives benefitting from the Transaction were involved in the preparation of financial projections used in appraisals of BDO stock that formed the basis of the stock appraisal relied upon to set the ESOP purchase price;

f. Whether BDO and Board adequately monitored the performance of State Street in approving the Transaction;

g. Whether the ESOP Trustees were aware of fiduciary breaches that resulted in the Transaction;

h. Whether the ESOP engaged in prohibited transactions;

i. The amount of losses suffered by the ESOP as a result of the unlawful conduct alleged herein;

j.      The proper form of equitable and injunctive relief; and

k.      The extent to which any non-fiduciary Defendants are subject to equitable remedies and relief.

176.    **Typicality.** Plaintiff's claims are typical of the claims of the Class because (among other things): (a) he is employed by BDO and is a participant in the Plan; (b) to the extent that Plaintiff seeks relief on behalf of the Plan pursuant to § 502(a)(2) of ERISA, 29 U.S.C. § 1132(a)(2), his claims are not only typical of, but the same as, a claim under § 502(a)(2) brought by any other Class member; (c) to the extent that Plaintiff seeks equitable relief, that relief would affect all Class members equally; and (d) all of the Class members were injured and continue to be injured in the same manner, because each of them overpaid for BDO stock as a result of the same alleged breaches of fiduciary duty and prohibited transactions.

177.    **Adequacy.** Plaintiff will fairly and adequately protect the interests of the Class and is committed to the vigorous representation of the Class. Plaintiff's retained counsel, Cohen Milstein Sellers and Toll PLLC ("Cohen Milstein"), is experienced in class action and ERISA litigation, and Plaintiff has no interests antagonistic to or in conflict with the interests of the Class.

178.    **Rule 23(b)(1)(A).** Class certification is appropriate pursuant to Federal Rule of Civil Procedure 23(b)(1)(A). Fiduciaries of ERISA-covered plans have a legal obligation to act consistently with respect to all similarly situated participants and to act in the best interests of the ESOP and its participants. This action challenges whether Defendants acted consistently with their fiduciary duties or otherwise violated ERISA as to the ESOP as a whole. As a result, prosecution of separate actions by individual members would create the risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants relating to the ESOP. The Class may be certified under Rule 23(b)(1)(A).

179.    **Rule 23(b)(1)(B).** Class certification is also appropriate pursuant to Federal Rule

of Civil Procedure 23(b)(1)(B). Administration of an ERISA-covered plan requires that all similarly situated participants be treated the same. Resolving whether Defendants fulfilled their fiduciary obligations to the ESOP and engaged in prohibited transactions with respect to the Plan would, as a practical matter, be dispositive of the interests of the other participants in the ESOP and would substantially impair or impede their ability to protect their interests if they are not made parties to this litigation by being included in the Class. Further, the relief granted by the Court, including any equitable relief, injunctive relief, or accounting of profits, may be dispositive of the interests of other class members.

180.     **Rule 23(b)(2).** Additionally and alternatively, class certification is appropriate pursuant to Federal Rule of Civil Procedure 23(b)(2) because Defendants have acted or refused to act on grounds generally applicable to the Class, making appropriate declaratory and injunctive relief with respect to Plaintiff and the Class as a whole. This action challenges whether Defendants acted consistently with their fiduciary duties or otherwise violated ERISA as to the ESOP as a whole. The members of the Class are entitled to declaratory and injunctive relief to remedy Defendants' fiduciary violations. Further, as ERISA is based on trust law, any monetary relief consists of equitable monetary relief that is either provided directly by the declaratory or injunctive relief or flows as a necessary consequence of that relief.

181.     **Rule 23(b)(3)**. Additionally and alternatively, class certification is appropriate pursuant to Federal Rule of Civil Procedure 23(b)(3) because questions of law and fact common to all Class members predominate over any questions affecting individual members of the Class, and because a class action is superior to other available methods for the fair and efficient adjudication of this action. Common questions related to liability will necessarily predominate over any individual questions because Defendants' duties and obligations were uniform to all

participants and therefore all members of the Class. Plaintiff and all Class members have been harmed by the ESOP paying more than fair market value for BDO stock in the Transaction. As relief and any recovery will be on behalf of the Plan, common questions as to remedies will likewise predominate over any individual issues.

182.    A class action is a superior method to other available methods for the fair and efficient adjudication of this action. As the claims are brought on behalf of the ESOP, the issues in this litigation will be most efficiently resolved in a single proceeding rather than multiple proceedings. The losses suffered by individual Class members are small compared to the expense and burden of individual prosecution of this action. In addition, class certification is superior because it will obviate the need for unduly duplicative litigation which might result in inconsistent judgments about Defendants' duties with regard to the ESOP.

183.    Notice will be provided to all members of the Class to the extent required by Federal Rule 23.

## V.    CAUSES OF ACTION

### Count I
### Prohibited Transaction in Violation of ERISA § 406(a), 29 U.S.C. § 1106(a)
### (Against BDO and the Board)

184.    Plaintiff incorporates the preceding paragraphs as though set forth herein.

185.    ERISA § 406(a)(1), 29 U.S.C. § 1106(a)(1), requires that a plan fiduciary "shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect (A) sale or exchange, or leasing of any property between the plan and a party in interest," or a "(D) transfer to, or use by or for the benefit of a party in interest, of any assets of the plan."

186.    ERISA § 406(a)(1)(B), 29 U.S.C. § 1106(a)(1)(B), provides that a plan fiduciary shall not cause the plan to engage in a transaction, if he knows or should know that such transaction

constitutes the direct or indirect loan of money between the plan and a party in interest, which includes Company insiders.

187.     ERISA § 3(14), 29 U.S.C. § 1002(14), defines a "party in interest" to include

- "any fiduciary … of such employee benefit plan;"

- "an employer any of whose employees are covered by such plan;" or

- "an employee, officer, [or] director . . . or a 10 percent or more shareholder" of an employer whose employees are covered by the ESOP;

ERISA § 3(14)(A), (C), (H), and (F), 29 U.S.C. § 1002(14)(A), (C), (H), and (F).

188.     The ESOP purchased BDO stock from the Company's principals. Each principal is or was an employee, officer, or director of BDO, whose employees are participants in the ESOP. As such, each of the Company's principals is a party in interest to the ESOP within the meaning of ERISA § 3(14), 29 U.S.C. § 1002(14).

189.     The ESOP's purchase of BDO common stock from the Company's principals constituted a direct or indirect exchange of property between the ESOP and parties in interest in violation of ERISA § 406(a)(1)(A), 29 U.S.C. § 1106(a)(1)(A), as well as a transfer of ESOP assets to the principals in violation of ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D).

190.     Thereafter, each individual payment to the principals by the ESOP constituted another indirect exchange of property between the ESOP and the principals in violation of ERISA § 406(a)(1)(A), 29 U.S.C. § 1106(a)(1)(A), as well as a transfer of the ESOP assets to the principals in violation of ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D).

191.     The provision of debt through the Company to fund the Transaction constituted separate prohibited transactions in violation of ERISA § 406(a)(1)(B), 29 U.S.C. § 1106(a)(1)(B).

192.     Each payment by the ESOP of principal or interest to the principals or to the Company in connection with these loans constitutes an independent violation of ERISA §

406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D).

193.    BDO and the Board orchestrated the Transaction by working with personal advisors who designed a complicated leveraged Transaction that caused the ESOP to purchase BDO shares for more than fair market value and caused the ESOP to endure unreasonable financing terms as part of the ESOP Transaction.

194.    BDO, acting through the Board, committed a fiduciary act by selecting and appointing State Street as the trustee for the Transaction and the affiliated ESOP Committee as Trustee after the Transaction.

195.    Implicit in their power to appoint fiduciaries is BDO and the Board's duty to monitor and ensure that the appointed fiduciaries are not performing poorly.

196.    BDO and the Board Defendants breached their fiduciary duties and caused the numerous prohibited transactions by, *inter alia*, failing to monitor State Street's actions during the relevant period and providing State Street with incomplete and inaccurate information, knowing that State Street would rely on that information when deciding whether to approve the Transaction.

197.    Accordingly, BDO and the Board Defendants' actions caused losses to the ESOP and are thus liable for appropriate relief under ERISA § 409, 29 U.S.C. § 1109, and ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), in connection with those prohibited transactions.

## Count II
## Prohibited Transaction in Violation of ERISA § 406(b), 29 U.S.C. § 1106(b)
### (Against the Board)

198.    Plaintiff incorporates the preceding paragraphs as though set forth herein.

199.    ERISA § 406(b)(1), 29 U.S.C. § 1106(b)(1), prohibits a fiduciary from "deal[ing] with the assets of the plan in his [or her] own interest or for his [or her] own account[.]"

200.    ERISA § 406(b)(3), 29 U.S.C. § 1106(b)(3), prohibits a plan fiduciary from "receiv[ing] any consideration for his [or her] own personal account from any party dealing with

such plan in connection with a transaction involving the assets of the plan." 29 U.S.C. § 1106(b)(3).

201.    As alleged above, the Board was a fiduciary of the BDO ESOP before, during and after the Transaction.

202.    As alleged above, the Board orchestrated and caused the sale of BDO stock to the ESOP in the Transaction to enrich themselves and thus dealt with ESOP assets in their own interest within the meaning of ERISA § 406(b)(1), 29 U.S.C. § 1106(b)(1).

203.    As fiduciaries, the Board caused the ESOP Transaction whereby Board members received consideration for their own personal accounts in the Transaction within the meaning of ERISA § 406(b)(3), 29 U.S.C. § 1106(b)(3).

204.    These prohibited transactions caused losses to the ESOP and enriched the Board members.

205.    The Board is liable for appropriate relief under ERISA § 409, 29 U.S.C. § 1109, and ERISA § 502(a)(2) and (3), 29 U.S.C. § 1132(a)(2) and (3), for these prohibited transactions.

<u>Count III</u>
<u>Breaches of Fiduciary Duty in Violation of ERISA §§ 404(a)(1)(A) and (B), 29</u>
<u>U.S.C. §§ 1104(a)(1)(A) and (B)</u>
**(Against BDO and the Board)**

206.    Plaintiffs incorporate the preceding paragraphs as though set forth herein.

207.    The ESOP grants the Company, acting through the Board of Directors, the power to appoint and remove the trustee of the ESOP.

208.    Exercising this power, the Board selected and appointed State Street as trustee solely to approve the ESOP Transaction and then selected and appointed insiders (the ESOP Trustees) as trustees of the ESOP after the consummation of the Transaction.

209.    The Board who are responsible for selection, retention and monitoring of Plan fiduciaries are themselves fiduciaries with respect to the ESOP, and are subject to ERISA's duties of loyalty and prudence with regard to the selection and retention of their appointed fiduciaries. *See* 29 C.F.R. § 2509.75-8 (D-4) (2023).

210.    BDO is additionally named as the Plan Administrator and administers the ESOP through the Board.

211.    BDO and the Board breached their fiduciary duties by failing to provide complete and accurate information to State Street and by not appropriately monitoring State Street as the trustee during the Transaction. After appointing State Street to serve in this role, BDO and the Board had an ongoing obligation to provide complete and accurate information to State Street and to monitor its work to ensure that it was acting in compliance with statutory standards under ERISA. *See* 29 C.F.R. § 2509.75-8 (FR-17) (2023). However, BDO and the Board failed to do so and thus enabled State Street to approve the Transaction for a sale price that far exceeded the fair market value of the shares that were purchased.

212.    Among other things, BDO and the Board:

38

    a.      failed to make sure that State Street had adequate controls over its fiduciary processes, including protections to ensure that it hired competent valuation advisors and did not unreasonably rely on flawed valuations of BDO stock;

    b.      failed to make sure that State Street and its advisors received complete and accurate information in connection with the ESOP Transaction, including information relating to potential business risks such as increasing audit engagement deficiencies which resulted in fines;

    c.      failed to make sure that State Street received accurate and realistic financial projections during the due diligence process;

    d.      failed to make sure that State Street fully considered all relevant factors with respect to the Transaction;

    e.      failed to monitor State Street fiduciary processes; and

    f.      failed to ensure that State Street took appropriate remedial action after the Transaction.

213.    The Board and BDO are liable for appropriate relief under ERISA § 409, 29 U.S.C. § 1109, and ERISA §§ 502(a)(2) and (3), 29 U.S.C. §§ 1132(a)(2) and (3), for their failure to appropriately monitor State Street as the Trustee in a manner consistent with ERISA's fiduciary standards.

### Count IV
### Co-Fiduciary Liability Under ERISA § 405(a), 29 U.S.C. §§ 1105(a)
### (Against all Defendants)

214.    Plaintiffs incorporate the preceding paragraphs as though set forth herein.

215.    ERISA § 405(a), 29 U.S.C. § 1105(a) provides that a fiduciary "with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan … if he participates knowingly in … an act or omission of such other fiduciary…; if, by his failure to comply with section 1104(a)(1) … he has enabled such other fiduciary to commit a breach; or if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach."

216.    As discussed above, the Defendants were all Executive level or Board members

who facilitated the preparation of materials used to value the Company and the Transaction itself. As such, Defendants had knowledge of the fiduciary breaches and the prohibited transactions set forth herein, and knowingly participated in and facilitated those prohibited transactions.

217.     BDO and the Board enabled breaches during the ESOP Transaction by, among other things, preparing and providing inaccurate and unreasonable financial information to be used for the valuation of the Company.

218.     Defendants made no effort, much less reasonable efforts, to remedy those fiduciary breaches and prohibited transactions.

219.     Based on the foregoing, the Defendants are liable as co-fiduciaries under ERISA § 405(a), 29 U.S.C. § 1105(a), for others' fiduciary breaches and other ERISA violations, and subject to appropriate relief under ERISA § 409, 29 U.S.C. § 1109, and ERISA §§ 502(a)(2) and (3), 29 U.S.C. §§ 1132(a)(2) and (3).

## VI.     <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiffs, on behalf of the Plan and the class, pray that judgment be entered against Defendants on each Count and that the Court grant all available relief to address the ERISA violations referenced herein, including (among other things):

A.     Declaring that Defendants have each breached their fiduciary duties under ERISA;

B.     Enjoining Defendants from further violations of their fiduciary responsibilities, obligations, and duties;

C.     Removing ESOP Trustees as the Trustee of the BDO ESOP and barring it from serving as a fiduciary of the ESOP in the future;

D.     Appointing a new independent fiduciary to manage the BDO ESOP and ordering the costs of such independent fiduciary be paid for by Defendants;

E.     Ordering each fiduciary found to have violated ERISA to restore all losses resulting from their fiduciary breaches and to disgorge all profits made through use of assets of the ESOP;

F.     Ordering that Defendants provide other appropriate equitable relief to the ESOP, including but not limited to providing an accounting for profits, ordering surcharge against Defendants to restore losses to the ESOP, rescinding or reforming the Transaction, and imposing a constructive trust and/or equitable lien on any funds wrongfully held by any of the Defendants;

G.     Enjoining the Defendants from dissipating any of the proceeds they received from the Transaction held in their actual or constructive possession until the ESOP participants' rights can be adjudicated;

H.     Enjoining the Defendants from transferring or disposing of any of the proceeds they received from the Transaction to any person or entity, which would prejudice, frustrate, or impair the ESOP participants' ability to recover the same;

I.     Requiring Defendants to pay attorneys' fees and costs pursuant to ERISA § 502(g), 29 U.S.C. § 1132(g), and/or ordering payment of fees and expenses to Plaintiffs' counsel on the basis of the common benefit or common fund doctrine out of any money recovered for the class;

J.     Awarding pre-judgment interest and post-judgment interest; and

K.     Awarding such other and further relief that the Court determines to be appropriate pursuant to ERISA § 502(a)(2) and/or § 502(a)(3), 29 U.S.C. § 1132(a)(2) and/or 1132(a)(3), or pursuant to Rule 54(c) of the Federal Rules of Civil Procedure, or that is otherwise equitable and just.

September 11, 2025                                      Respectfully submitted,


                                                                      */s/ Michelle C. Yau*
                                                                      Michelle C. Yau, Mass. Bar # 657236
                                                                      Daniel R. Sutter (*pro hac vice*)
                                                                      Ryan A. Wheeler (*pro hac vice*)
                                                                      Caroline E. Bressman (*pro hac vice*)
                                                                      Cohen Milstein Sellers & Toll PLLC
                                                                      1100 New York Ave NW ● 8th Floor
                                                                      Washington, DC 20005
                                                                      (202) 408-4600
                                                                      myau@cohenmilstein.com
                                                                      dsutter@cohenmilstein.com
                                                                      rwheeler@cohenmilstein.com
                                                                      cbressman@cohenmilstein.com

                                                                      *Attorneys for Plaintiff*