**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **TRISTIN TAYLOR,**<br>**Plaintiff,**<br>**v.**<br>**BDO USA, P.C. ET AL.,**<br>**Defendants.** | **Case No. 25-cv-10128-DJC** |

**MEMORANDUM AND ORDER**

**CASPER, C.J.** **October 19, 2026**

## I. Introduction

Plaintiff Tristin Taylor ("Taylor") filed this lawsuit against BDO USA, P.C. ("BDO"), its Board of Directors (the "Board"), including Wayne Berson, and the trustees of the BDO USA Employee Stock Ownership Plan (the "BDO ESOP Trustees"), including individuals Catherine Moy, Stephen Ferrara, Mark Ellenbogen, Matthew Becker, William Eisig, and Patrick Donaghue (collectively, "Defendants"), alleging violations of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a)(2) and 29 U.S.C. § 1132(a)(3). D. 46 ¶ 1. Taylor filed the operative, amended complaint after another session of the Court dismissed the original complaint without prejudice. D. 44. Taylor's allegations revolve around an August 31, 2023 transaction (the "Transaction"), wherein the Employee Stock Ownership Plan (the "ESOP") purchased 42% of BDO stock for approximately $100 per share. Id. ¶¶ 3, 10. Taylor alleges that the Transaction constituted a prohibited transaction under ERISA (Counts I-II), that BDO and the

Board failed to monitor State Street Global Advisors Trust Company ("State Street"), the ESOP's trustee during the Transaction, (Count III), and that all Defendants are liable as co-fiduciaries for the alleged ERISA violations (Count IV). Id. ¶¶ 184-219. Defendants have moved to dismiss pursuant to Fed. R. Civ. P. 12(b)(1) and Fed. R. Civ. P. 12(b)(6). D. 49. Taylor has moved to strike particular exhibits and sources cited in Defendants' motion. D. 53. For the reasons stated below, the Court DENIES the motion to strike as to Exhibit E and DENIES the remainder of that motion as moot, id., ALLOWS the motion to dismiss under Fed. R. Civ. P. 12(b)(1), D. 49, and DENIES same under Fed. R. Civ. P. 12(b)(6), id., as moot.

## II. Standard of Review

When confronted with a Fed. R. Civ. P. 12(b)(1) motion, "the district court must construe the complaint liberally, treating all well-pleaded facts as true and indulging all reasonable inferences in favor of the plaintiff." Aversa v. United States, 99 F.3d 1200, 1209-10 (1st Cir. 1996) (citing Murphy v. United States, 45 F.3d 520, 522 (1st Cir. 1995)). "[T]he party invoking the jurisdiction of a federal court carries the burden of proving its existence." Murphy, 45 F.3d at 522 (quoting Taber Partners, I v. Merit Builders, Inc., 987 F.2d 57, 60 (1st Cir. 1993)). Standing is a jurisdictional issue, see P.R. Tel. Co. v. T-Mobile P.R. LLC, 678 F.3d 49, 57 (1st Cir. 2012), and, accordingly, challenges to standing are properly considered under Rule 12(b)(1), see Kolancian v. Snowden, 532 F. Supp. 2d 260, 261 (D. Mass. 2008).

## III. Background

The following summary is based upon the allegations in the complaint, which the Court accepts as true for the purpose of resolving the motion to dismiss.

### A. The Parties

Taylor has been an employee of BDO since 2019. D. 46 ¶ 20. He is a participant in the ESOP, id., a pension plan subject to ERISA "whereby the individual retirement accounts of current

and former employees are invested entirely" in BDO stock. Id. ¶¶ 2, 52. Under the ESOP, employer contributions made on behalf of employees are invested in the employer's stock as part of an employee's compensation. Id. ¶¶ 54-57. Taylor currently has "20% vested in the BDO shares allocated to his ESOP account." Id. ¶ 20.

BDO is a United States division of BDO Global and the fifth largest accounting firm in the country, id. ¶¶ 35-36, "provid[ing] accounting, tax, and advisory services throughout the United States," id. ¶ 21. BDO sponsors the ESOP and is a named fiduciary of the ESOP. Id. ¶¶ 22, 24. Prior to July 1, 2023, BDO was structured as a limited liability partnership; on that date, BDO converted into a Professional Association. Id. ¶¶ 37-42. BDO again changed its corporate form on August 30, 2023 to a "P.C." Id. ¶ 43.

The Board is a named fiduciary of the ESOP and "assumes the power, duties and responsibilities of the [ESOP] Administrator, which is BDO," including the power to remove and appoint the ESOP trustee. Id. ¶ 26. Defendant Wayne Berson is the Chief Executive Officer of BDO and Chairman of the Board. Id. ¶ 27.

BDO ESOP Trustees is a "committee of BDO executives and Board members" that have been appointed by BDO to serve as the ESOP's Trustee. Id. ¶ 32. It includes individuals Catherine Moy (BDO's Chief People Officer and Executive Team member), id. ¶ 33, Mark Ellenbogen (BDO's Chief Operating Officer and Executive Team member), id., Matthew K. Becker (BDO's National Managing Principal of Tax, Executive Team member, previous Chair of the Board), id., William Eisig (BDO's National Managing Principal of Assurance and Executive Team member), id., Patrick Donoghue (BDO's National Managing Principal of Corporate Finance and Transaction Advisory Services), id., and Stephen R. Ferrara (previous Chief Operating Officer and Executive Team member of BDO), id. Each of the individual trustees is a fiduciary of the ESOP. Id. ¶ 34.

### B. The Transaction

On August 31, 2023, shortly following BDO's change in corporate form to a "P.C.," id. ¶¶ 41-43, BDO established the ESOP, a pension plan subject to ERISA, id. ¶¶ 51-53. The Transaction occurred the same day. Id. ¶ 65. Prior to the Transaction, the ESOP had no assets. Id. ¶ 13. To facilitate the Transaction, BDO entered into an acquisition loan with Apollo Global Management affiliates to secure the necessary funds (the "Apollo Loan"). Id. ¶¶ 13, 81. This loan came with an interest rate of 11.36% (as of December 31, 2023). Id. ¶ 83. BDO then loaned the funds gained through the Apollo Loan to the ESOP in a separate transaction (the "BDO Loan"). Id. ¶ 81. Also prior to the Transaction, the Board appointed State Street to serve as the independent trustee of the ESOP during the Transaction. Id. ¶¶ 12, 28. As trustee, State Street was required to perform due diligence into BDO's business and ensure that the valuation of BDO's stock in the Transaction was accurate, reasonable and "no more than" fair market value. Id. ¶ 70. State Street engaged Duff & Phelps as a valuation advisor to assist in its valuation of BDO's stock, id. ¶ 72, and ultimately approved the Transaction and all its terms, id. ¶ 28. After the Transaction, the Board replaced State Street with the BDO ESOP Trustees, alleged "insiders" of BDO. Id. ¶¶ 80, 208.

In the Transaction, the ESOP purchased 42% of the Company's common stock for approximately $100 per share, totaling $1,242,025,992. Id. ¶¶ 10, 65. As alleged, this amount exceeded the fair market value of the purchased shares. To prove such overpayment, Taylor alleges: (1) that client "credits," or retainer amounts for work not yet performed, were included in BDO's revenue recognition process leading up to the Transaction, id. ¶¶ 102-03, (2) that BDO's declining audit performance, and growing scrutiny from the Public Company Accounting Oversight Board ("PCAOB"), was hidden from State Street "prior to the Transaction close," id.

¶¶ 5, 126, (3) that the ESOP did not receive a discount for its lack of control over BDO or the Board via the Transaction, id. ¶ 166, (4) that the loan used to finance the Transaction resulted in a high interest rate borne by ESOP participants, id. ¶ 14, and (5) that certain shareholders received warrants in connection with the Transaction, which gave the holder the right to purchase additional stock from BDO at the strike price of $59 per share, id. ¶ 68.

## IV. Procedural History

Taylor instituted this action on January 17, 2025. D. 1. Defendants first moved to dismiss on April 21, 2025, D. 29, which another session (Stearns, J.) of this Court allowed without prejudice, D. 44. Taylor filed an amended complaint on September 11, 2025, including allegations regarding State Street. D. 46. In light of such allegations, Judge Stearns recused himself under 28 U.S.C. § 455 due to a personal conflict, D. 62, and this matter was reassigned to this session, D. 63. Defendants have again moved to dismiss, attaching exhibits in support of the motion. D. 49. Taylor opposes the motion to dismiss, D. 55, and has moved to strike specific exhibits and sources included by Defendants in their motion. D. 53. The Court heard the parties on the pending motions and took these matters under advisement. D. 78.

## V. Discussion

Taylor alleges that BDO and the Board breached their fiduciary duties and caused prohibited transactions in violation of ERISA § 406(a), 29 U.S.C. § 1106(a), by "orchestrat[ing]" the Transaction and appointing the trustees of the ESOP during and after the Transaction (Count I), D. 46 ¶¶ 184-97; that Board members breached their fiduciary duties and caused prohibited transactions under ERISA § 406(b), 29 U.S.C. § 1106(b), by causing the Transaction and "receiv[ing] consideration for their own personal accounts in the Transaction" (Count II), id. ¶¶ 198-205; that BDO and the Board breached their fiduciary duties in violation of ERISA

§§ 404(a)(1)(A) and (B), 29 U.S.C. §§ 1104(a)(1)(A) and (B), by failing to provide complete and accurate information to State Street and failing to monitor its actions as a trustee during the Transaction, id. ¶¶ 206-13 (Count III); and that all Defendants are liable as co-fiduciaries under ERISA § 405(a), 29 U.S.C. §§ 1105(a), for their "preparing and providing inaccurate and unreasonable financial information" used to value BDO in the Transaction, id. ¶¶ 214-19. Taylor seeks ESOP-wide class certification, id. ¶ 170, as well as declaratory, injunctive and equitable relief and seeks attorneys' fees and costs, id. at 40-41.

**A. Motion to Dismiss Under Fed. R. Civ. P. 12(b)(1)**

Defendants contend that Taylor has failed to allege "an injury-in-fact fairly traceable to Defendants' conduct" and therefore lacks standing. D. 50 at 12-20. Taylor alleges two core theories of injury, or "two ways that [Taylor] was allocated [fewer] shares," D. 79 at 20: (1) that the "excessive interest payments" associated with the debt taken on by the ESOP to fund the Transaction (namely, the Apollo Loan) reduced the number of shares allocated to Taylor's retirement account by at least ten shares, or $650, D. 46 ¶ 140, and (2) that the overvaluation, through various means, of BDO's stock in the Transaction reduced the number of shares allocated to Taylor's retirement account by at least seven shares, or $450, id. ¶ 119. Attacking both theories, Defendants argue (1) that Taylor wrongly conflates the Apollo Loan with the BDO Loan, and only the latter "potentially impacts the release of shares into participant accounts," and (2) that Taylor's theory of overpayment in the Transaction is based on speculation and ignores State Street's role as independent trustee of the ESOP during the Transaction. D. 50 at 12-20.

"At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.'" Lujan v. Defenders of Wildlife, 504

U.S. 555, 560–61 (1992) (internal citation omitted). To establish an injury-in-fact, "a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" Spokeo, Inc. v. Robins, 578 U.S. 330, 339 (2016) (quoting Lujan, 504 U.S. at 560). "[I]ntangible injuries can nevertheless be concrete." Id. at 340. However, "Congress' role in identifying and elevating intangible harms does not mean that a plaintiff automatically satisfies the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right." Id. at 341. "Article III standing requires a concrete injury even in the context of a statutory violation." Id. "[W]rongfully retained or misused assets" can constitute a tangible harm, "even if no economic loss results." Merrimon v. Unum Life Ins. Co. of Am., 758 F.3d 46, 53 (1st Cir. 2014).

*1. Previous Dismissal Order*

Taylor's initial complaint, D. 1, was dismissed without prejudice, D. 44. While the court did not specify whether the initial complaint was dismissed under Fed. R. Civ. P. 12(b)(1) or Fed. R. Civ. P. 12(b)(6), D. 44 at 11, the court's analysis focused on standing, particularly the alleged injury suffered by Taylor, id. at 8-9, and, accordingly, is relevant to this Court's analysis of Defendants' renewed Fed. R. Civ. P. 12(b)(1) motion.

The court described Taylor's two-fold theory of injury in the initial complaint as follows: "that he and the prospective class members [had] been harmed by [1] the ESOP paying more than fair market value for BDO stock in consummating the Transaction . . . and [2] incurring an unreasonably high interest rate of 11.36% on the debt used to finance the Transaction, all of which caused a reduction in the value of their individual ESOP holdings." Id. at 6.

In ordering dismissal, the Court (Stearns, J.) explained that Taylor "point[ed] to no instance in which a tangible loss of value was actually incurred by [Taylor]." Id. at 7-8. Taylor did not allege that he "made any monetary contribution to the ESOP Transaction or that he was saddled with any obligation to repay the loan to Apollo" and did not even "ventur[e] a guess" as to the value of his ESOP account." Id. at 8. Taylor, therefore, failed to establish that "any harm flowed from the Transaction to [Taylor]," and provided only "mere speculation" that he had suffered an injury. Id.

The court further determined that Taylor "d[id] not adequately allege any measure that suggests that the ESOP in fact overpaid for the BDO stock," id. at 8-9, listing Taylor's theories of overvaluation: "(1) employees were pressured to mischaracterize client 'credits' (retainers or prepayments) as revenue, which misled State Street as to the value of BDO stock; (2) the valuation did not account for audit performance issues documented by the Public Company Accounting Oversight Board (PCAOB); (3) the $1.3 billion price that the ESOP paid for the stock did not include sufficient discounts for the ESOP obtaining no control over the BDO or its governance; and (4) the ESOP was forced to enter into unreasonable financing terms, including a loan from Apollo at an 'unreasonably high interest rate' of 11.36%." Id. at 9. The court determined that Taylor "d[id] not plausibly allege that State Street did not consider any of [the above] facts in evaluating the ESOP Transaction, much less that BDO or its Board failed to adequately disclose them to State Street." Id. at 9-10. Taylor also did not allege "that State Street's performance with respect to the Transaction was deficient [as] there is no factual suggestion in the Complaint that State Street lacked qualifications or failed to perform due diligence in responsibly evaluating the terms of the Transaction." Id. at 10. The Court further stated that Taylor did not "contain any plausible inferences, only mere conjecture, that the actual defendants named in this case, BDO,

the Board, and the BDO ESOP Trustees, personally contributed to State Street's alleged overvaluation of BDO's stock." Id. at 10.

Here, the Court's standing analysis focuses on whether Taylor plausibly alleged an injury, either a "tangible loss of value" resulting from the high interest imposed by the Apollo Loan, D. 44 at 7; see D. 79 at 20, or that the ESOP, despite State Street's role as independent trustee, D. 44 at 9-10, "in fact overpaid" for the BDO stock, id. at 8-9; see D. 79 at 20. As explained below, he has not.

### 2. *Taylor Has Not Established an Injury to the ESOP Traceable to the Apollo Loan*

Both Taylor and Defendants agree that the ESOP was not a party to the Apollo Loan; instead, funds from the Apollo Loan were transferred from BDO to the ESOP via the separate and distinct BDO Loan. D. 46 ¶ 81; D. 50 at 12-14. The parties disagree as to whether the ESOP was obligated to pay the high interest rate associated with the Apollo Loan. D. 50 at 12-14; D. 55 at 8. Specifically, Taylor alleges that that, "[u]nder the terms of the ESOP, shares are released for allocation into participant [ESOP] accounts as the principal on the [Apollo] Loan is paid down." D. 46 ¶ 61. He argues that "the higher the rate of interest on the [Apollo Loan], the fewer shares allocated to participant [ESOP] accounts in a given year," necessarily leading to "fewer shares [being] allocated to [Taylor]'s account." Id. ¶¶ 61, 139. Unlike in his initial complaint, D. 55-2 at 28 (providing redline of initial and amended complaints), Taylor also now alleges a tangible loss of value stemming from the Apollo Loan, specifically in the form of "10 additional shares of [BDO] stock]," or "at least $650 in retirement benefits," that "would have been allocated" to "his account . . . if the [Apollo Loan] carried a 7.39% interest rate,"[1] rather than its 11.36% interest

[1] Taylor draws the 7.39% interest rate from the "ICE BofA US High Yield Index Effective Yield," which "is an index which tracks the performance of US dollar denominated below

rate. D. 46 ¶¶ 136, 140; cf. D. 44 at 7-8 (reasoning that complaint "points to no instance in which a tangible loss of value was actually incurred by Taylor").

Taylor's claims regarding the impact of the Apollo Loan on his retirement account, however, are undercut by the record, that this Court may consider even on this motion to dismiss, provided by Defendants indicating that Taylor was not, in fact, "saddled with" its repayment. D. 44 at 8; see D. 79 at 21 (stating that Taylor "did[ not] have access to the loan documents" when pleading). Exhibit B, which Taylor has not moved to strike, D. 54 at 7-9, and which is incorporated by reference to the amended complaint, see D. 79 at 7, is a copy of the BDO ESOP, effective as of August 31, 2023, D. 50-1 ¶ 3; see Chea v. Lite Star ESOP Comm., No. 23-cv-00647-JLT-SAB, 2024 WL 4357002, at *2 (E.D. Cal. Sept. 30, 2024) (considering "proffered ESOP documents and their content" where "complaint refer[red] to the ESOP Plan"). Section 2.32 of the BDO ESOP defines an "Exempt Loan" as, *inter alia*, a "loan or loans made to the [ESOP]" by a "Disqualified Person," and further defines "Disqualified Person" as, *inter alia*, a fiduciary. D. 50-3 at 21; id. at 15. The BDO Loan, D. 46 ¶ 81, not the Apollo Loan, id., was "made to the [ESOP]" by its fiduciary, BDO, and fits within the definition of an Exempt Loan, D. 50-3 at 21. Section 12.4(b) of the BDO ESOP then provides that "upon payment of any portion of the Exempt Loan, Corporation Stock . . . will be released." Id. at 84. Accordingly, because the BDO Loan, not the Apollo Loan, fits the definition of an Exempt Loan, id. at 21, the BDO Loan, not the Apollo Loan, impacts the release formula for the ESOP's shares, id. at 84, contradicting Taylor's theory of injury under the Apollo Loan, e.g., D. 46 ¶ 61. Further, Exhibit E,[2] a redacted copy of the Combination

investment grade rated corporate debt publicly issued in the US domestic market." D. 46 ¶¶ 135-36. As argued by Defendants, D. 50 at 14 n.6 , Taylor does not provide facts indicating that BDO could have secured a lower rate from another lender.

[2] Taylor moves to strike Exhibit E, among other documents, as outside the four corners of the amended complaint and too heavily redacted to be verifiable. D. 54 at 7-8. "'While the court

ESOP Credit Agreement between BDO and State Street Bank and Trust Company, dated August 31, 2023—i.e., the agreement controlling the BDO Loan, D. 50-6 at 2—then provides that the BDO Loan has an interest rate of only 3.96% per annum, well below that of the Apollo Loan. D. 50-6 at 4 (providing § 1.10). Given these facts, it is difficult for this Court to follow how "the higher [] rate of interest on the [Apollo] Loan," specifically, led to "fewer shares [being] allocated to [Taylor's] account." D. 46 ¶¶ 138-41.[3]

In response, Taylor broadens his theory of causation, maintaining that the 11.36% interest rate on the Apollo Loan put financial strain on BDO by allegedly threatening its solvency, causing layoffs and negatively impacting its stock value and benefit offerings. D. 55 at 19; see e.g., id. at 8 (citing D. 46 ¶¶ 138-39, 141). Despite these generalized allegations of harm suffered by BDO

---

generally may not consider materials outside the pleadings on a Rule 12(b)(6) motion, it may consider such materials on a Rule 12(b)(1) motion.'" Grafton & Upton R.R. Co. v. Town of Hopedale, No. 22-cv-40080-ADB, 2023 WL 2761205, at *3 (D. Mass. Mar. 31, 2023) (quoting Gonzalez v. United States, 284 F.3d 281, 288 (1st Cir. 2002)); see also Chea, 2024 WL 4357002, at *3 (considering "proffered ESOP documents," including loan materials and governing documents, where "Plaintiff's claims [were] predicated upon her participation in the ESOP," and where the "ESOP Transaction was financed by the ESOP Loan and Note"). Because Defendant's arguments related to the Apollo Loan "factually attack[] the complaint," the Court may consider Exhibit E. Eggert v. Merrimac Paper Co. Leveraged Emp. Stock Ownership Plan & Tr. ("The ESOP"), 311 F. Supp. 2d 245, 248 (D. Mass. 2004) (providing that "when the moving party factually attacks the complaint [under Rule 12(b)(1)], the allegations have no presumptive truthfulness and the Court must weigh the evidence and may consider extrinsic evidence from affidavits and other documents"); see Bacon v. Tompkins, No. 18-cv-12156-NMG, 2019 WL 10817148, at *3 (D. Mass. June 12, 2019) (reasserting principle that "courts . . . have an independent obligation to determine whether subject-matter jurisdiction exists") (internal quotation marks omitted) (quoting Arbaugh v. Y&H Corp., 546 U.S. 500, 514 (2006))). Contrary to Taylor's assertions, D. 54 at 7, the fact that Exhibit E is heavily redacted does not alter this analysis. See Johansen v. Verizon Communications, Inc., No. 08-cv-10096-NG, 2008 WL 11511712, at *11 (D. Mass. Sept. 29, 2008) (denying motion to strike "abridged" document included in defendants' motion to dismiss because of "undeniable centrality" of document to claims and defendants' affirmation of its validity).

[3] The Court DENIES the motion to strike, D. 53, as to Exhibit E, and otherwise DENIES the motion as moot as to the other exhibits, upon which the Court does not rely. See Ascend Learning, LLC v. Bryan, No. 22-cv-11978-ADB, 2024 WL 3834893, at *4 (D. Mass. Aug. 14, 2024).

due to the Apollo Loan, Taylor does not dispute that Exhibits B and E, together, debunk his claim that "under the terms of the ESOP," D. 46 ¶¶ 60-61, employer contributions to the ESOP were directly impacted by the interest rate on the Apollo Loan. In the alternative, Taylor raises that both parties agree that the ESOP incurred a "$42 million in interest expense" in the last quarter of 2023 and argues that "over the course of a full year, that is well into a double-digit interest rate." D. 55 at 18; D. 79 at 22. The "$42 million" interest expense, however, is a line item with neither label nor explanation as to its provenance—there is no indication that it is linked to either the Apollo Loan or the Transaction. D. 50-2 at 13; see D. 79 at 22 (acknowledging that "there's a 42 million payment by the ESOP . . . on whatever loan it had"). Indeed, the governing ESOP documents before the Court indicate that the interest rate imposed on the ESOP was that of the BDO Loan: 3.96%. D. 50-6 at 4.

In light of the foregoing, the Court cannot identify a tangible loss in value traceable to the Apollo Loan that would confer standing on Taylor.

*3. Taylor Has Not Established an Injury to the ESOP Traceable to State Street*

Defendants dispute Taylor's claims of overpayment, arguing that Taylor's valuation assumptions ignore "post-pandemic growth," D. 50 at 15, that PCAOB enforcement increased industry-wide during the period alleged by Taylor, id. at 16-17, and that Taylor has overstated the relevance of lawsuits involving BDO, id. 17-20. Defendants further argue that, even if Taylor's claims were adequately alleged, Taylor has still failed to establish that State Street, as the independent trustee of the ESOP during the Transaction, failed in its duty as backstop to consider any of the alleged bad conduct or to otherwise perform its own due diligence. See e.g., id. at 16 (arguing "Plaintiff has alleged no facts at all about *State Street's process* in handling forecasted revenue as part of its transaction analysis") (emphasis in original); id. at 17 (arguing that "BDO's

[PCAOB] inspection comments were made available well before [the Transaction], which undermines any suggestion that this issue was hidden or kept secret from State Street"); id. at 18-19 (arguing that Taylor failed "[t]o suggest that State Street did not analyze issues involving client credits or that any facts were hidden" regarding lawsuits involving BDO). In so doing, Defendants echo the reasoning of the previous order dismissing the original complaint, D. 44, where the court listed Taylor's theories of injury (which remain largely the same, with the addition of Taylor's claims regarding warrants), id. at 9, stated that the complaint failed to adequately allege a measure of overpayment, id. at 8, and concluded that Taylor failed to "plausibly allege that State Street did not consider any of these facts in evaluating the ESOP transaction," id. at 10. Here, the Court assesses whether, accepting all alleged facts as true, Taylor has adequately alleged that Defendants misled State Street, or that State Street's performance was otherwise deficient, such that State Street's valuation was impacted.

Dyer v. Green, No. 25-cv-11152-RGS, 2025 WL 4056746, at *1 (D. Mass. Nov. 26, 2025), appeal filed, No. 26-1010 (1st Cir. Jan. 7, 2026), is instructive here. In that action, the plaintiff alleged that "the [ESOP] was funded with overpriced shares of stock . . . , resulting in a diminution of the [ESOP]'s present and future value to participants." Id. at *1. The defendant individuals and entities moved to dismiss for lack of standing, id. at *3, and the court ultimately allowed the motion without prejudice, id. at *4-*5 (distinguishing case cited by plaintiff where "court did not consider whether the plaintiffs had adequately alleged an Article III cognizable injury"). The court first discussed the impact of the defendant entity being a closely held company, explaining that "[u]nder ERISA, there is no prohibition against an ESOP's acquisition of a private company's stock so long as it pays a reasonable price for the stock," defining a "reasonable price . . . as the fair market value of the stock as determined in good faith by the plan trustee." Id. at *4 (citing 29

U.S.C. § 1108(17)(B)(ii) and distinguishing case cited by plaintiff where it discussed overpayment in context of "publicly traded company, [where] the market value of the preferred stock could [] be readily determined with reasonable certainty"). The court explained that "[e]conomists have struggled to develop plausible models for determining the objective value of stock in closely-held corporations," such that plaintiff's failure to establish overpayment, or an unreasonable price, was "not surprising." Id. The court then "[s]uggested valuation methods [for closely held companies,] includ[ing] a comparison of the profitability of a privately owned business to similar publicly traded companies or tangible internal factors such as cash flows, historical growth, and the ownership of human capital and technology." Id.

Under this framework, the court determined that the plaintiff failed to plausibly allege that the price was "unreasonable." Id. at *4. First, the court reasoned that the plaintiff had advanced "no concrete allegations that [the defendant-trustee] acted in bad faith[,] otherwise breached his fiduciary duty when valuing the [stock]," id. at *3, or that the defendant-trustee's valuation "was [otherwise] unreasonable," id. at *4. Second, the court reasoned that the preferred shares at issue were arguably deserving of a premium as a "more secure investment for the [ESOP]." Id. at *5. Third, the court determined that any injury "is based solely on speculation," because the plaintiff "remain[ed] employed" at the defendant entity and "ha[d] made no attempt to withdraw his holdings in the [ESOP]," and, further, failed to offer "any objective measure by which he or any other [ESOP] participant can show that he or she will accrue an actual future loss of benefits should the [ESOP] be terminated or if the Company is sold." Id.

Here, as before, Taylor offers "no factual suggestion in the Complaint that State Street lacked qualifications or failed to perform due diligence in responsibly evaluating the terms of the Transaction." D. 44 at 10. Taylor has not alleged that State Street "acted in bad faith or otherwise

breached [its] fiduciary duty." Dyer, 2025 WL 4056746, at *4 (dismissing plaintiff's claims specific to a defendant-trustee of the ESOP where plaintiff failed to provide "concrete allegations" to same). Here, State Street is not named as a defendant. Cf. id. Instead, Taylor alleges that State Street "relied upon," D. 46 ¶ 92, and "used," id. ¶ 94, the allegedly misleading information provided by BDO and the Board, that State Street lacked audit authority to validate such information, id. ¶ 156, and that the "accuracy of each valuation methodology applied" by State Street in their independent valuation hinged upon, "among other things," information provided by Defendants, id. ¶ 114. In the amended complaint, Taylor has supplemented his claims regarding the allegedly incomplete and inaccurate information given by Defendants to State Street prior to the Transaction. See, e.g., D. 55-2 ¶ 76 (alleging State Street was not present at an emergency meeting called by Defendants to approve Transaction); id. ¶¶ 92, 110, 112, 114, 150 (alleging that BDO gave State Street a stock valuation marred by inflated earnings, inaccurate projections and material omissions); id. ¶¶ 126-27, 152-57 (alleging that BDO and the Board failed to fully disclose PCAOB inspection results or other unfavorable information to State Street, the appointed trustee of the Transaction); id. ¶ 97 (alleging misleading behavior was intentional and geared toward increasing the price of the Transaction).

Even still, the question remains whether Taylor has adequately alleged that Defendants' provision of faulty information to State Street, the independent trustee, so impacted its valuation as to cause the alleged overpayment. To that end, Taylor has not alleged that the information provided to State Street by Defendants existed in a vacuum, as, even as alleged, State Street's valuation relied on "other things," D. 46 ¶ 114, and he makes no allegations regarding the sufficiency of State Street's valuation process, cf. Sellers v. Trs. of Bos. Coll., 729 F. Supp. 3d 136, 162 (D. Mass. 2024) (stating that "an independent investment advisor does not have a

talismanic effect," such that "courts must look not only at the fiduciary's procedures, but also at the 'methods used to carry out those procedures [and] . . . thoroughness of the analysis of the data collected'" (alteration in original) (internal quotation marks omitted) (quoting Jacobs v. Verizon Commc'ns Inc., No. 16-cv-1082-PGG-RWL, 2023 WL 3027311, at *20, *22 (S.D.N.Y. Apr. 20, 2023))).

While the Court agrees with Taylor that the hiring of an independent trustee such as State Street "is not a whitewash," D. 55 at 17 (internal quotation marks omitted) (quoting Chao v. Hall Holding Co., 285 F.3d 415, 430 (6th Cir. 2002)), the alleged facts here are distinguishable from the cases relied upon by Taylor. Taylor does not allege that State Street did not know the purpose of the valuation, cf. Chao, 285 F.3d at 430-31 (providing that expert "was unaware that the purpose of the valuation 'was to establish a value to have an ESOP buy a stake in [defendant company]'" and "was never given the true purpose for which his valuation was to be used"), that State Street valued the wrong entity, rather than BDO, cf. id. at 431 (providing that "[expert]'s valuation of [one entity] was used to establish [another entity's] value"), or that State Street failed to consider the Transaction, specifically, in its valuation, cf. Sellers, 729 F. Supp. 3d at 162 (requiring that "the fiduciary must show that the imprudent investment was actually considered" under ERISA); Gamache v. Hogue, 446 F. Supp. 3d 1315, 1326-27 (M.D. Ga. 2020) (allowing plaintiffs' claim for breach of fiduciary duty where independent expert's report "did not contain any financial analysis or consider [either] the dilutive impact of the" refinancing at issue or even "the ESOP's best interest"). To the contrary, the allegations establish that State Street was specifically "selected and appointed . . . to serve as the independent trustee of the ESOP to represent the ESOP's interest in the Transaction," D. 46 ¶ 28, which required it to "perform due diligence into BDO's business

and . . . ensure that the valuation of BDO stock was based on accurate and reasonable information and that the ESOP paid no more than fair market value," id. ¶ 70.

Further, as pointed out by Defendants, D. 58 at 7 n.2, the cases cited by Taylor to establish "that ESOP participants like [Taylor] have Article III standing" include the ESOP trustees that signed off on the challenged overpayments or transactions as defendants, D. 55 at 13; see Ramirez v. AMPAM Parks Mech., Inc., No. 24-cv-1038-KK-DTBX, 2025 WL 621547, at *2, *4 (C.D. Cal. Feb. 14, 2025) (determining that plaintiffs "adequately allege Trustee Defendants' actions caused their injuries" where they "were responsible for deciding to purchase at an inflated price"); Bowers v. Russell, 717 F. Supp. 3d 165, 171-73 (D. Mass. 2024) (determining that plaintiffs "adequately pled an injury in fact" where "[ESOP]'s trustee" during alleged overpayment among defendants); Chea, 2024 WL 4357002, at *4 (determining that "Plaintiff plausibly allege[d] that, as an ESOP participant, she was injured by the prohibited ESOP Transaction caused by the [ESOP trustee]'s insufficient valuation analysis and process"); Bonds on behalf of Flat Rock Metal & Bar Processing Emp. Stock Ownership Plan v. Heeter, No. 23-12045, 2024 WL 2059721, at *2-*3 (E.D. Mich. May 8, 2024) (determining that plaintiffs "satisf[ied] the standing elements" where "losses were caused by the Trustee's failure" to investigate issues and negotiate fair price); Laidig v. Greatbanc Tr. Co., No. 22-cv-1296, 2023 WL 1319624, at *2, *5 (N.D. Ill. Jan. 31, 2023) (concluding that "Plaintiffs have pled concrete financial harm to their shares" where "trustee of the [ESOP]," which had "sole and exclusive discretion to authorize and negotiate the ESOP Transaction on behalf of the [ESOP]," among defendants); Lloyd v. Argent Tr. Co., No. 22-cv-4129-DLC, 2022 WL 17542071, at *1-*2 (S.D.N.Y. Dec. 6, 2022) (concluding plaintiffs adequately alleged injury-in-fact where "trustee of the ESOP" among defendants and where plaintiffs challenged trustee's "flawed" valuation process and "inappropriate[] reli[ance] on

[inflated] financial projections"), aff'd, No. 22-cv-3116, 2025 WL 1546509 (2d Cir. Jan. 3, 2025); Placht on behalf of Symbria Inc. Emp. Stock Ownership Plan v. Argent Tr. Co., No. 21-cv-5783, 2022 WL 3226809, at *1, *3-4 (N.D. Ill. Aug. 10, 2022) (determining plaintiff "sufficiently alleged an injury for this stage of the case" where "[ESOP]'s Trustee leading up to and through the ESOP Transaction" among defendants and injury alleged to be a "'result of [the trustee's] misvaluation'" (alteration in original) (quoting McMaken v. GreatBanc Trust Co., No. 17-cv-4983, 2019 WL 1468157, at *10 (N.D. Ill. Apr. 3, 2019))), a consideration not present here, where Taylor's allegations revolve around the Transaction, and the ESOP trustee during the Transaction, State Street, is not a named defendant, see Dyer, 2025 WL 4056746, at *3 (determining that defendant "had not yet replaced [the defendant-trustee] at the time of the stock's valuation and as such it had yet to assume any duty under ERISA").

Taylor's claims regarding the allegedly incomplete and inaccurate information given by fiduciary Defendants to State Street do not support the next inference necessary to establish overpayment, i.e., that State Street's ability to value BDO was so compromised as to be unreasonable, or above fair market value, regardless of their own good faith and due diligence. Cf. New England Biolabs, Inc. v. Miller, No. 20-cv-11234-DJC, 2020 WL 6871015, at *4 (D. Mass. Nov. 23, 2020) (concluding injury-in-fact was alleged where overpayment alleged was by the ESOP to one particular account holder and by mistake). Accordingly, Taylor has not adequately alleged that State Street's valuation was unreasonable, made in bad faith, or otherwise in breach of their fiduciary duties, so as to constitute an overpayment.[4]

[4] As raised by Defendants, D. 82 at 1-2, the supplemental authority provided by Taylor does not address the threshold standing issue that is decisive here, and therefore does not alter the foregoing analysis, D. 81 (providing partial summary judgment order in Harrison v. Envision Mgmt. Holding, Inc. Bd. of Dirs., No. 21-cv-00304-CNS-MDB (D. Col. Aug. 20, 2026), D. 369).

## VI. Conclusion

For the foregoing reasons, the Court DENIES Taylor's motion to strike as to Exhibit E, D. 53, and the remainder of that motion as moot, id. Defendants also seek dismissal with prejudice, D. 50 at 25, arguing that the amended complaint is Taylor's second attempt to allege plausible claims.[5] The Court, therefore, ALLOWS Defendants' motion to dismiss, D. 49, under Fed. R. Civ. P. 12(b)(1) with prejudice and DENIES Defendants' motion to dismiss, id., as to Fed. R. Civ. P. 12(b)(6) as moot.

**So Ordered.**

/s Denise J. Casper
Chief United States District Judge

[5] The Court acknowledges Taylor's argument that the amended complaint is a "whole new ball game" and should not be dismissed merely as "re-pled." D. 79 at 18 (citing Kenney v. State St. Corp., No. 09-cv-10750-DJC, 2011 WL 4344452, at *3 (D. Mass. Sept. 15, 2011)). In light of the foregoing discussion as to how, specifically, the amended complaint still fails to adequately allege an injury, even in light of its additional allegations, this argument fails. Kenney, 2011 WL 4344452, at *3.